**TOWN OF CONCORD, MASSACHU-SETTS, et al., Plaintiffs, Appellees,**

v.

**BOSTON EDISON COMPANY, Defendant, Appellant.**

No. 89–1872.

United States Court of Appeals, First Circuit.

Heard April 5, 1990.

Decided Sept. 21, 1990.

**18**

William L. Patton with whom Robert J. Stillman, Ropes & Gray, Boston, Mass., George F. Bruder, Carmen L. Gentile, Bruder, Gentile & Marcoux, Washington, D.C., John J. Desmond, III and Jeffrey N. Stevens, Boston, Mass., were on brief, for defendant, appellant.

Charles F. Wheatley, Jr., with whom Don Charles Uthus, Peter A. Goldsmith, Annapolis, Md., Timothy P. Ingram, Arlington, Va., Pace J. McConkie, Allen D. Freemyer, Wheatley & Ranquist, Salt Lake City, Utah, Charles R. Parrott, Nutter, McClennen & Fish, Boston, Mass., Albert S. Robinson, and Grindle, Robinson & Kertzman, Wellesley, Mass., were on brief, for plaintiffs, appellees.

Before BREYER, Chief Judge, and CAMPBELL and SELYA, Circuit Judges.

BREYER, Chief Judge.

The chief question raised by this appeal is whether a pricing practice known as a price squeeze violates the antitrust laws when it takes place in a fully regulated industry.

To understand the nature of a price squeeze the reader must keep three basic facts in mind. First, a firm can engage in a price squeeze only if it operates at two levels of an industry, and only if its competitors at one level are also its customers. Alcoa, the defendant in a famous antitrust case, provides an example of such a firm. *See United States v. Aluminum Co.*, 148 F.2d 416 (2d Cir.1945) (*Alcoa*). For several decades, Alcoa controlled the domestic production of almost all of America's aluminum ingot. It sold its ingot to independent fabricators, some of whom turned the ingot into aluminum sheet; it also fabricated sheet itself. Both Alcoa and the independents sold the finished sheet to the same group of consumers. Alcoa, therefore, operated at two levels of the aluminum business—ingot production and sheet production—and it competed with its customers (the independent sheet fabricators) at the second level.

Second, a price squeeze occurs when the integrated firm's price at the first level is too high, or its price at the second level is too low, for the independent to cover its costs and stay in business. Suppose, hypothetically, that Alcoa's price for ingot was $100 per ton; that the independents' costs of fabricating ingot into sheet was $50 per ton; and that Alcoa's price for sheet was $145 per ton. Under these circumstances, the independents, with ingot costs of $100 and fabricating costs of $50, would have no "room" to make a profit, for they could not charge more than $145 for sheet without losing all of their business to Alcoa. Alcoa's prices of $100 for ingot and $145 for sheet would squeeze the independents out of business.

Third, Judge Learned Hand, in *United States v. Aluminum Co.*, *supra*, wrote that a price squeeze violates Sherman Act § 2, 15 U.S.C. § 2(a), when (1) the firm conducting the squeeze has monopoly power at the first industry level, (2) its price at this level is "higher than a 'fair price,'" and (3) its price at the second level is so low that its competitors cannot match the price and still make a "living profit." *See id.* at 437–38. Other courts, using substantially similar language, have reached the same conclusion. *See, e.g., Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 808–11 (3d Cir.1984), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986); *George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 553 (2d Cir.1977); *Carl Hizel & Sons, Inc. v. Browning–Ferris Indus., Inc.*, 600 F.Supp. 161, 161–62 (D.Colo.1985).

This case raises a narrow question about the price squeeze theory of antitrust liability: does Sherman Act § 2 forbid a govern-

mentally regulated firm with *fully regulated* prices—prices that are regulated at both industry levels—from asking regulators to approve prices that could create a price squeeze? Despite language in some cases suggesting that the answer is yes, *see* pp. 28–29, *infra,* our analysis of the likely effects of a price squeeze in a fully regulated industry leads us to conclude that the answer is no. Effective price regulation at both the first and second industry levels makes it unlikely that requesting such rates will ordinarily create a serious risk of significant anticompetitive harm. At the same time, regulatory circumstances create a significant risk that a court's efforts to stop such price requests will bring about the very harms—diminished efficiency, higher prices—that the antitrust laws seek to prevent. We conclude, therefore, that price regulation will, in most cases, prevent a price squeeze from constituting an "exclusionary practice" of the sort that Sherman Act § 2 forbids.

We also conclude that, regardless, the plaintiffs in this particular case did not demonstrate the existence of an unlawful exclusionary practice, for the evidence does not support a critical jury finding. It does not show that the defendant, Boston Edison, possessed monopoly power in the primary product market.

For these reasons, we reverse a judgment in favor of the plaintiffs.

## I

### Background

The private firms that supply American homes and businesses with electricity are called "investor-owned utilities." Most of these firms are fully integrated, operating at all three levels of the electric power industry: (1) they *produce* (or generate) electricity, (2) they *transmit* electricity from generators to local distributors, and (3) they *distribute* electricity at the local level. *See generally* Joskow, *Mixing Regulatory and Antitrust Policies in the Electric Power Industry: The Price Squeeze and Retail Market Competition,* in *Antitrust and Regulation* 175–78 (F.M. Fisher ed. 1985) [hereinafter *Joskow*];

Meeks, *Concentration in the Electric Power Industry: The Impact of Antitrust Policy,* 72 Colum.L.Rev. 64, 67–69 (1972) [hereinafter *Meeks* ]. Despite being fully integrated, these firms typically do not distribute only electricity that they themselves have generated. Rather, in many parts of the country, groups of firms have formed power "pools" through which they coordinate the generation, transmission, and distribution of electricity throughout a large geographical area. These pooling arrangements aim to enhance reliable and efficient electric service by matching customer demands (which change minute by minute) with available low-cost supply sources. As a result of power pooling, an integrated utility will often wind up distributing electricity generated by a different, interconnected company. *See generally* 16 U.S.C. § 824a–1 (governing pooling agreements); *New England Power Pool Agreement,* 56 F.P.C. 1562 (1976) (describing the New England Power Pool), *petitions for review denied, Municipalities of Groton v. FERC,* 587 F.2d 1296 (D.C.Cir.1978); C. Phillips, Jr., *The Regulation of Public Utilities* 585–92 (1988) (discussing coordination among electric utilities) [hereinafter *C. Phillips* ]. Even in the absence of explicit pooling arrangements, the many physical interconnections among American utilities, combined with the tendency of electricity to flow instantaneously along interconnected lines to wherever it is demanded, make it likely that electricity distributed by one utility will be supplied by another. One legal consequence of these interconnections and pooling arrangements is that most electricity flows "interstate," permitting federal, as well as state, regulation of electricity. *See Cincinnati Gas & Elec. Co. v. FPC,* 376 F.2d 506, 507–09 (6th Cir.), *cert. denied,* 389 U.S. 842, 88 S.Ct. 77, 19 L.Ed.2d 106 (1967); *Public Serv. Co. v. FPC,* 375 F.2d 100 (7th Cir.), *cert. denied,* 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 992 (1967); *see generally FPC v. Florida Power & Light Co.,* 404 U.S. 453, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972).

Investor-owned utilities of the type we have described supply approximately 75%

of the nation's electricity. The remainder is supplied by government- and consumer-owned systems. Unlike their investor-owned counterparts, these systems tend *not* to be integrated. The federal government, for example, generates about 10% of the nation's electricity (at systems such as the Tennessee Valley Authority), but sells most of it to independent distributors. Approximately 2,000 municipalities and cooperatives own small-scale distribution companies, but only a handful generate their own electricity; most purchase the electricity they distribute from investor-owned utilities or from the federal government. In contrast to investor-owned systems, municipal systems typically enjoy generous tax and financing subsidies and substantial freedom from regulation. *See generally Joskow* at 175–78; Joskow and Schmalensee, *Markets for Power: An Analysis of Electric Utility Deregulation* 17–20 (1983); Lopatka, *The Electric Utility Price Squeeze as an Antitrust Cause of Action*, 31 UCLA L.Rev. 563, 568 & n. 29 (1984) [hereinafter *Lopatka*]; *Meeks*, 72 Colum. L.J. at 67–69.

The record before us reveals facts typical of the national pattern. The defendant, Boston Edison, is a fully integrated investor-owned utility. It belongs to the New England Power Pool ("NEPOOL"). It transmits electricity (either self-generated or, *e.g.*, secured from other NEPOOL members) to 52 cities and towns in eastern Massachusetts. Each of these towns has only one distribution system serving all of the towns' inhabitants. In 39 of the towns, Edison owns the distribution system. In the remaining towns, either the town itself or another utility owns the distribution system. Concord and Wellesley, the plaintiffs, are two of the towns that own their own distribution systems. They take all of their electricity over Edison's transmission lines, and buy most of it directly from Boston Edison.

Edison's rates are completely regulated. The Federal Energy Regulatory Commission ("FERC," or the "Commission") regulates the rates that Edison charges when it sells electricity at "wholesale" (*i.e.*, when it sells electricity to other firms, including municipal distributors, for resale to final customers). *See* 16 U.S.C. § 824 (regulating the "transmission ... and ... sale of electric energy at wholesale in interstate commerce"). Before Edison can increase its rates, it must publish the new rates in the Federal Register and give notice of the proposed increase to each of its wholesale customers. *See* 18 C.F.R. § 35.8 (1990). If an interested party raises a legitimate question about the rate increase, FERC normally will suspend the new rates for up to five months, investigate them, and, if it has not completed its investigation by then, permit them to take effect *subject to refund* in the event it ultimately rejects them. *See* 16 U.S.C. § 824d(d, e). Similarly, the Massachusetts Department of Public Utilities ("DPU") regulates the "retail" rates that Boston Edison charges to consumers in the 39 cities and towns in which it distributes electricity. *See* M.G.L. c. 164, §§ 93–94G. In contrast, as we mentioned earlier, no agency regulates the retail rates that municipal distributors, such as Concord and Wellesley, charge to their customers, for these distributorships are non-profit entities indirectly controlled (through the ballot) by the very customers they serve.

Between 1984 and 1987, Edison filed a series of wholesale rate increases with FERC. Wellesley and Concord vigorously opposed those rate increases before the Commission. In each case, after briefly suspending the rates, the Commission allowed them to take effect subject to refund. The towns sought judicial review of FERC's decisions. Eventually, with one exception not relevant here, *see Towns of Wellesley, Concord and Norwood v. FERC*, 786 F.2d 463 (1st Cir.1986), this court upheld as lawful the relevant FERC determinations, *see Towns of Concord and Wellesley v. FERC*, 844 F.2d 891 (1st Cir. 1988); *Boston Edison Co. v. FERC*, 885 F.2d 962 (1st Cir.1989).

Concord and Wellesley then attacked the same wholesale rate increases on another legal front. They brought this antitrust action in federal district court. They pointed out that these *wholesale* rate increases filed with FERC were not matched by cor-

responding *retail* rate increases. Thus, over a three-year period, Edison's rates to Concord and Wellesley increased while its rates to its own retail customers in the 39 towns surrounding Concord and Wellesley stayed roughly the same. The effect of this disparity, said Concord and Wellesley, was to put the two towns in a price squeeze. If they did not raise their own retail rates to reflect the higher cost of buying electricity from Edison, they would make less money; but if they raised their retail rates while Edison's stayed the same, customers for whom they and Edison compete (say, a small manufacturer with high energy costs) might decide to forego Concord and Wellesley and settle in a town served by Edison. In light of the resulting potential harm to their electricity distributing businesses, Concord and Wellesley argued that the wholesale price increases, in the absence of corresponding retail price increases, amounted to unlawful monopolization. *See* Sherman Act § 2, 15 U.S.C. § 2(a). A jury agreed, and the district court declined to overturn its verdict. *See Town of Concord v. Boston Edison Co.*, 721 F.Supp. 1456 (D.Mass.1989). We disagree with the district court, and we reverse the judgment.

## II

### *The Price Squeeze*

■ The basic legal principles that govern this monopolization case are well settled. Even though Boston Edison is a regulated firm, it has no blanket immunity from the antitrust laws. *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 372–75, 93 S.Ct. 1022, 1027–28, 35 L.Ed.2d 359 (1973); *see also Cantor v. Detroit Edison*, 428 U.S. 579, 596 n. 35, 96 S.Ct. 3110, 3120 n. 35, 49 L.Ed.2d 1141 (1976); *Gulf States Utils. Co. v. FPC*, 411 U.S. 747, 758–59, 93 S.Ct. 1870, 1877–78, 36 L.Ed.2d 635 (1973). The antitrust law relevant in this case makes it unlawful for a firm to "monopolize ... any part of the trade or commerce among the several States." Sherman Act § 2, 15 U.S.C. § 2(a). To prove a violation of this statute, a plaintiff must demonstrate (1) that the defendant

possesses "monopoly power in the relevant market," and (2) that the defendant has acquired or maintained that power by improper means. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 230 (1st Cir.1983). Like many courts and commentators, we refer to improper methods of acquiring or maintaining monopoly power as "exclusionary conduct." Borrowing from Professors Areeda and Turner, we have defined "exclusionary conduct" as " 'conduct, other than competition on the merits or restraints reasonably "necessary" to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power.' " *Barry Wright*, 724 F.2d at 230 (quoting 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 626, at 83 (1978) [hereinafter *Areeda & Turner*]).

■ We shall assume for now that Edison has monopoly power in a relevant market and begin by examining whether Edison's pricing practices amount to exclusionary conduct. Traditional antitrust principles will guide our analysis. We shall compare the challenged practice's likely anticompetitive effects with its potentially legitimate business justifications. *See Clamp–All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 486 (1st Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989); *Interface Group, Inc. v. Massachusetts Port Auth.*, 816 F.2d 9, 10 (1st Cir.1987); *Meeks*, 72 Colum.L.J. at 80. In doing so, we shall bear in mind that a practice is not "anticompetitive" simply because it harms competitors. After all, almost all business activity, desirable and undesirable alike, seeks to advance a firm's fortunes at the expense of its competitors. Rather, a practice is "anticompetitive" only if it harms the competitive process. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488–89, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701 (1977); *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962); *Clamp–All*, 851 F.2d at 486. It harms that

process when it obstructs the achievement of competition's basic goals—lower prices, better products, and more efficient production methods. *See, e.g., Grappone, Inc. v. Subaru of New England, Inc.,* 858 F.2d 792, 794 (1st Cir.1988); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 228–29 (D.C.Cir.1986), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987); *Olympia Equip. Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 379 (7th Cir.1986), *on denial of r'hrg,* 802 F.2d 217, *cert. denied,* 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987); *Assam Drug Co. v. Miller Brewing Co.,* 798 F.2d 311, 315 (8th Cir.1986); *Westman Comm'n Co. v. Hobart Int'l, Inc.,* 796 F.2d 1216, 1220 (10th Cir.1986), *cert. denied,* 486 U.S. 1005, 108 S.Ct. 1728, 100 L.Ed.2d 192 (1988); *see also Reiter v. Sonotone,* 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979) ("Congress designed the Sherman Act as a 'consumer welfare prescription.' ") (quoting R. Bork, *The Antitrust Paradox* 66 (1978)); *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 500–01, 60 S.Ct. 982, 996–97, 84 L.Ed. 1311 (1940) ("Restraints on competition" do not constitute antitrust violations unless they "have or [are] intended to have an effect upon prices in the market or otherwise ... deprive purchasers or consumers of the advantages which they derive from free competition").

■ Finally, we shall take account of the institutional fact that antitrust rules are court-administered rules. They must be clear enough for lawyers to explain them to clients. They must be administratively workable and therefore cannot always take account of every complex economic circumstance or qualification. *See Barry Wright,* 724 F.2d at 234. (Indeed, the need for clarity and administrability sometimes leads to *per se* rules that prohibit inquiry into the actual harms and benefits of challenged conduct. *See Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).) They must be designed with the knowledge that firms ultimately act, not in precise conformity with the literal language of complex rules,

but in reaction to what they see as the likely outcome of court proceedings.

These last-mentioned administrative considerations are particularly important when courts apply antitrust law to a regulated industry. That is because "regulation" and "antitrust" typically aim at similar goals— *i.e.,* low and economically efficient prices, innovation, and efficient production methods—but they seek to achieve these goals in very different ways. Economic regulators seek to achieve them *directly* by controlling prices through rules and regulations; antitrust seeks to achieve them *indirectly* by promoting and preserving a process that tends to bring them about. An antitrust rule that seeks to promote competition but nonetheless interferes with regulatory controls could undercut the very objectives the antitrust laws are designed to serve. Thus, where regulatory and antitrust regimes coexist, *see, e.g., Otter Tail,* 410 U.S. at 372, 93 S.Ct. at 1027 (electric industry); *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 352, 83 S.Ct. 1715, 1735, 10 L.Ed.2d 915 (1963) (bank mergers), antitrust analysis must sensitively "recognize and reflect the distinctive economic and legal setting" of the regulated industry to which it applies. Watson & Brunner, *Monopolization by Regulated "Monopolies": The Search for Substantive Standards,* 22 Antitrust Bull. 559, 565 (1977) [hereinafter *Watson & Brunner*]; *see generally Meeks, supra.*

■ For reasons we shall now set out, these principles lead us to conclude that a price squeeze of the sort at issue here does not ordinarily violate Sherman Act § 2 where the defendant's prices are regulated at both the primary and secondary levels. In so holding, we *are not* saying either that the antitrust laws do not apply in this regulatory context, or that they somehow apply less stringently here than elsewhere. Rather, we are saying that, in light of regulatory rules, constraints, and practices, the price squeeze at issue here is not ordinarily exclusionary, and, for that reason, it does not violate the Sherman Act. *Cf.* 1 *Areeda & Turner* ¶ 223d, at 140 (noting that "antitrust courts can and do consider

the particular circumstances of an industry and therefore adjust their usual rules to the existence, extent, and nature of regulation"); *Watson & Brunner*, 22 Antitrust Bull. at 560 (warning that "the dogmatic transposition of monopolization concepts from conventional market settings to regulated industries" may produce results inimical to the goals of antitrust). We reach this conclusion by (1) analyzing the ordinary price squeeze, (2) comparing it to the "regulatory" price squeeze, and (3) noting that regulation makes a critical difference in terms of antitrust harms, benefits, and administrative considerations.

### A. Price Squeeze Liability in an Unregulated Industry

To explain our conclusion, we must first discuss the ordinary price squeeze case, the case of an unregulated monopolist whose prices (at, say, the wholesale and retail levels) leave inadequate room for an independent competitor (at, say, the retail level) to survive. Only if the reader understands the major antitrust harms, benefits, and administrative considerations in that ordinary case, and sees how they are rather evenly balanced, will he understand why price regulation tips that balance so significantly towards legality. *Cf.* 3 *Areeda & Turner* ¶ 729c, at 235–38 (arguing that *Alcoa* overstated the harms, understated the benefits, and disregarded significant administrative burdens associated with the ordinary price squeeze).

The antitrust argument against the price squeeze typically begins by observing that a "one-level" monopolist engaged in a prolonged price squeeze may drive independent competitors out of business and thereby extend its monopoly power to a second industry level. This fact alone, however, does not mean that a price squeeze is anticompetitive. Merely eliminating competitors is not necessarily anticompetitive, for, as we explained earlier, even legitimate business activity that succeeds in helping a firm will likely disadvantage the firm's competitors. *See* pp. 21–22, *supra*, and cases cited. Moreover, the extension of monopoly power from one to two levels does not *necessarily*, nor in an *obvious* way, give a firm added power to raise prices. As several members of the Supreme Court have pointed out, a "widely accepted" (albeit "counterintuitive") economic argument supports the conclusion of many commentators that "there is but one maximum monopoly profit to be gained from the sale of an end-product," 3 *Areeda & Turner* ¶ 725b at 199. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 36, 104 S.Ct. 1551, 1570, 80 L.Ed.2d 2 (O'Connor, J., concurring in the judgment); *see also* R. Bork, *The Antitrust Paradox* 229 (1978) ("[V]ertically related monopolies can take only one monopoly profit") [hereinafter *R. Bork*]; R. Posner & F. Easterbrook, *Antitrust* 870 (2d ed. 1989) ("There is only one monopoly profit to be made in a chain of production."). (For an intuitive explanation of this "counterintuitive" argument, see Appendix A to this opinion.) What difference does it make, one might ask, whether the monopolist obtains this "maximum monopoly profit" by controlling two industry levels or just one?

At least two arguments have been made in answer to this question. The first is that a monopolist who extends his monopoly to a second industry level raises "entry barriers," thereby fortifying his monopoly position. Assume, for example, that Alcoa has monopolized only ingot production and has raised its prices somewhat above the competitive level. Alcoa's monopoly position in ingot will no doubt deter some new firms from entering ingot production, but it might also attract some new firms hoping to obtain a share of Alcoa's supercompetitive profits. Now assume Alcoa extends its monopoly to sheet production as well, the industry level, say, that consumes most of Alcoa's ingot. New firms might now be more reluctant to enter *ingot* production, fearing that Alcoa, in its capacity as "sheet fabricator-monopolist," would refuse to buy ingot from the new ingot producer, or that it would drop its own ingot prices and take the industry's entire "single monopoly profit" from the sale of sheet. The new firm might conclude that the only prudent way to challenge Alcoa would be to enter the industry at *both* levels at once. Inso-

far as it is more difficult for a firm to enter an industry at two levels than at one, the monopolist, by expanding its monopoly power, has made entry by new firms more difficult. And insofar as the monopolist previously set prices cautiously to avoid attracting a competitive challenge, the added security of a two-level monopoly could even lead that monopolist to raise its prices. *See* 3 *Areeda & Turner* ¶ 725h, at 204–08; *see also id.* ¶ 1011, at 243–54; Shepherd, *Potential Competition Versus Actual Competition*, 42 Admin.L.Rev. 5–34 (1990).

The second argument against permitting extension of monopoly power concerns "non-price" competition. The existence of competitors at a second "level," irrespective of their effects upon price, provides an added incentive for the monopolist to develop better products and better, more efficient ways to produce the product. *See* 2 *Areeda & Turner* ¶¶ 402b2–402b3, at 269–70; *id.* ¶ 403c, at 272 & n. 3; 3 *Areeda & Turner* ¶ 725g, at 204. Indeed, a "second-level" independent firm that develops better products or more efficient production methods may thereby obtain the strength needed to challenge the monopolist at the "primary level."

We recognize that there are other arguments one might make about the possible anticompetitive effects of a price squeeze, *see generally* 3 *Turner & Areeda* ¶¶ 725e–725f, at 201–04 (reviewing other arguments); and we realize, as well, that scholars dispute the practical significance of the two arguments just made. *Compare* 3 *Areeda & Turner* ¶¶ 725g–725h, at 204–08 *with R. Bork* at 240–43. Nonetheless, we believe that other arguments (such as those related to economic price discrimination) tend to be inconclusive in respect to anticompetitive effects. *See* 3 *Areeda & Turner* ¶¶ 725e–725f, at 201–04; *R. Bork* at 241–42. We therefore believe that the two arguments just given are the most important of those that favor prohibiting a price squeeze; and we are willing to assume they would justify such a prohibition were there nothing to be said in favor of permitting prices that could create such a squeeze.

There are, however, at least two traditional circumstances in which prices that create a squeeze might simultaneously bring about economic benefits. First, the primary-level monopolist might carry out its second-level activities more efficiently than its independent competitors. If so, prices that squeeze the less efficient second-level competitors, even to the point of forcing them from the business, could (by lowering costs) lower prices, or, in any event, save economic resources. *See* 3 *Areeda & Turner* ¶ 725d, at 201 ("Whenever vertical integration produces new efficiencies, some of the cost savings ... [will] be translated into a price reduction and ... [will] save productive resources."); *R. Bork* at 243.

Second, prices that squeeze a "second-level" firm will benefit consumers whenever the "second-level" firm *is itself* a monopolist. *See Fishman v. Estate of Wirtz*, 807 F.2d 520, 563 (Easterbrook, J., dissenting) ("That successive monopolies injure consumers is a proposition on which there is unanimous agreement") (collecting authority). If, for example, ingot costs $40, the fabricating process costs $35, and the profit-maximizing price for sheet is $100, an ingot monopolist will charge $65 for the ingot, hoping that competition at the fabricating level will keep the total price at $100. If a different, independent monopolist dominates the fabricating level, however, that independent monopolist buying ingot at $65 will mark up the price by more than $35, because he wants to earn monopoly profits as well. The result will be a market price of more than $100, resulting in smaller monopoly profits overall (for the final price is too high), but greater profits for the second monopolist than if he sold sheet for only $100. (Appendix B to this opinion contains a numerical example that may help the interested reader understand intuitively why this is so.) Under these circumstances, entry by the ingot monopolist into the sheet-fabrication level—even by means of a price squeeze—will help the consumer by limiting the final price of sheet to $100. *Cf. Atlantic Richfield Co. v. USA Petroleum Co.,* — U.S. ——, 110

S.Ct. 1884, 1891, 109 L.Ed.2d 333 (1990) ("When a firm, or even a group of firms adhering to a vertical agreement, lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an 'anticompetitive' consequence of the claimed violation." (footnote omitted)); *see generally* 3 *Areeda & Turner* ¶ 725c, at 200–01.

Again, the price squeeze may have additional benefits, *see generally* 3 *Turner & Areeda* ¶¶ 725e–725f, at 201–04, and one can debate the empirical significance of those we have mentioned. But we believe that the two examples we have given show that prices that create a squeeze can, at least sometimes, have important beneficial effects.

Finally, we note that it is not easy for courts to administer Judge Hand's price squeeze test. That test makes it unlawful for a monopolist to charge more than a "fair price" for the primary product while simultaneously charging so little for the secondary product that its second-level competitors cannot make a "living profit." *See Alcoa*, 148 F.2d at 437–38. But how is a judge or jury to determine a "fair price?" Is it the price charged by other suppliers of the primary product? None exist. Is it the price that competition "would have set" were the primary level not monopolized? How can the court determine this price without examining costs and demands, indeed without acting like a rate-setting regulatory agency, the rate-setting proceedings of which often last for several years? Further, how is the court to decide the proper size of the price "gap?" Must it be large enough for all independent competing firms to make a "living profit," no matter how inefficient they may be? If not, how does one identify the "inefficient" firms? And how should the court respond when costs or demands change over time, as they inevitably will?

We do not say that these questions are unanswerable, but we have said enough to show why antitrust courts normally avoid direct price administration, relying on rules and remedies (such as structural remedies, *e.g.*, prohibiting certain vertical mergers)

that are easier to administer. *See United States v. Trenton Potteries Co.*, 273 U.S. 392, 397, 47 S.Ct. 377, 379, 71 L.Ed. 700 (1927) (observing that "[t]he reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow"); *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 283 (6th Cir.1898) (Taft, J.) (stating that to inquire into the reasonableness of prices is to "set sail on a sea of doubt"), *aff'd*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); 3 *Areeda & Turner* ¶ 701, at 148–50 ("The courts correctly regard as uncongenial and foreign to the Sherman Act the burden of continuously supervising economic performance.").

To reach *Alcoa*'s conclusion that the price squeeze is exclusionary, one must believe that the anticompetitive risks associated with a price squeeze outweigh the possible benefits and the adverse administrative considerations. We do not question that conclusion here, but we qualify it by noting that the harms and benefits (including the more doubtful ones we have glossed over, *see generally* 3 *Areeda & Turner* ¶¶ 725e–725f, at 201–04), are closely balanced. In light of this close balance, we should not blindly and automatically apply *Alcoa*'s price squeeze rules in the presence of significantly different economic circumstances such as full economic regulation.

### B. Price Squeeze Liability in a Regulated Industry

Full price regulation dramatically alters the calculus of antitrust harm

rates must be "just and reasonable"); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944) (A "reasonable" rate is one that permits the firm to recover its costs and earn a reasonable profit); *see generally* J. Bonbright, A. Danielsen & D. Kamerschen, *Principles of Public Utility Rates* (2d ed. 1988) (describing ratemaking principles) [hereinafter *J. Bonbright*].

For another thing, factors related to regulation, such as the economic ability of a market to support new entry, or the legal requirement that a firm secure permission to enter, are likelier to determine new entry into a regulated industry than is a new entrant's fear of a two-level monopolist's enhanced retaliatory power. After all, should the regulator decide that new entry is warranted, it typically- has the legal authority to prevent an existing "two-level" monopolist from improperly disadvantaging a new "second-level" competitor by, say, refusing to deal to with it or by charging unreasonably high prices. *See, e.g.,* 16 U.S.C. §§ 824f, 824i–824k (authorizing FERC to order interconnections, sales and wheeling of electricity among utilities); *see also* 2 A. Kahn, *The Economics of Regulation* 113–172 (discussing the concept of "natural monopoly") [hereinafter *A. Kahn*]; *Meeks,* 72 Colum.L.Rev. at 95 & n. 135 (noting that utilities in "all but a handful of states ... must obtain a certificate of public convenience and necessity to serve an area" with electricity) (collecting statutes).

Finally, regulation in the electricity industry makes it less likely that a price squeeze will actually drive independent distributors from the marketplace. Local electricity distribution, after all, is itself considered a "natural monopoly" with service typically provided by a single franchise company to relatively immobile customers. *See Joskow* at 178; *cf. Otter Tail,* 369, 93 S.Ct. at 1025. Higher electricity prices (or lower retail prices) will not lead the entire and Concord to pull up over. And the record that competition plaintiff towns for

customers living on the towns' borders, or for mobile high-energy-consuming industrial customers, is sufficiently important to threaten the plaintiffs with bankruptcy should such users switch to Edison. *Cf. Joskow* at 209–13 (arguing that, as a rule, there is little actual competition between electricity distributors). Even if an integrated utility such as Edison managed to set prices that severely squeezed a distributor, it could not take over the municipality's distribution area without the regulator's permission. *See, e.g.,* M.G.L. ch. 164 § 68 (Massachusetts municipality may not sell its distributorship without regulatory approval).

Second, regulators try to set prices that reflect costs. To the extent that they succeed, an integrated utility's prices are likely to squeeze independent distributors who buy from it at wholesale only if those distributors operate less efficiently, *i.e.,* at higher cost. Consequently, a rule preventing prices that create a squeeze will more likely discourage efficient operations and deprive consumers of prices that reflect lower costs.

Third, for institutional reasons, an antitrust rule making the price squeeze illegal threatens consumers. The plaintiffs say that Edison violated the antitrust laws by *asking* for rates (*i.e., filing* rate proposals) that would produce for Edison a "higher return" on its "wholesale sales than.... on its retail sales." *See* Appellee's Brief at 4–8, 35–36. Other courts considering price squeeze claims have also emphasized that the alleged antitrust violation consisted of proposing or requesting rates that would narrow the gap between wholesale and retail rates so as to squeeze existing retail competitors. *See, e.g., City of Kirkwood v. Union Elec. Co.,* 671 F.2d 1173, 1179 (8th Cir.1981) ("[T]he question" in a price squeeze case is "whether the defendant utility acted illegally *in proposing* a certain anticompetitive combination of rates") (emphasis added), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983); *City of Newark v. Delmarva Power & Light Co.,* 467 F.Supp. 763, 768 (D.Del. 1979) (chief allegation in price squeeze case

was that defendant "used its power to *initiate* rates ... to attempt to obtain an anticompetitive rate structure") (emphasis in original). A rule that penalizes the filing of wholesale rate increases would not necessarily lead firms to abandon wholesale rate increases; it could, instead, simply lead them to seek a retail rate increase whenever they seek a wholesale rate increase. (Conversely, it would discourage a utility from conceding that a retail price cut is reasonable unless it is also prepared to concede that a wholesale price cut is reasonable.) In this case, for example, the rule might have permitted Edison to escape liability by filing (or perhaps obtaining) a rate increase in the 39 cities and towns where it distributes electricity itself. Indeed, the rule would encourage Edison to seek a retail rate increase so high that a jury could not find the wholesale/retail gap too narrow. Such a rule of law (which could lead to unnecessary regulatory proceedings and unnecessary rate increases) would seem to work at cross-purposes with basic antitrust objectives. *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986) (warning courts against adopting rules or practices that "chill the very conduct the antitrust laws are designed to protect"); *Barry Wright*, 724 F.2d at 234 ("[W]e must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition.").

Fourth, an anti-price-squeeze rule, particularly the "equal profit earned at both levels" rule that plaintiffs advocate, presents special administrative difficulties in the regulatory context. For one thing, the Constitution guarantees a regulated firm a reasonable return on its investment, *see Hope Natural Gas Co., supra; Bluefield Water Works v. Public Serv. Comm'n*, 262 U.S. 679, 690, 43 S.Ct. 675, 678, 67 L.Ed. 1176 (1923); *see also* 16 U.S.C. §§ 824d(a), 824e(a) (rates must be "just and reasonable"). May courts prevent a utility from asking the regulator for a rate increase should the utility believe that current wholesale returns are, constitutionally speaking, too low? Similarly, what if the utility believes that different risks at different levels of the industry call for somewhat different rates of return?

For another thing, how will juries decide the amount of the firm's investment on which the "rate of return" is calculated? Profit, after all, is a return on a certain amount of investment. Much electricity investment is used to serve *both* wholesale and retail services. Accounting systems for allocating investment between different services or customer classes are notoriously complicated and sometimes arbitrary. *See J. Bonbright* at 495 (noting that dozens of schemes exist for allocation investment among customer classes) (collecting sources); *Joskow* at 180 ("Despite the legal distinction between 'retail sales' ... and 'wholesale sales,' ... essentially there is no functional distinction between generation and transmission facilities dedicated to retail and wholesale transactions."). Will juries be permitted to "second guess" the regulator's allocation rules or its specific investment allocation decisions? Is the jury (as may, in a sense, have occurred here) to be permitted to decide that the utility's allocation (following Commission allocation procedures) of, say, $100 million investment to distribution and $400 million to wholesale, should have been $200 million/$300 million instead (in which case, of course, the pre-existing 10% profit earned at each level would look like 5% earned at retail and 13% at wholesale). What antitrust benefit would be gained by permitting juries to speculate in this way? Would not the results likely be arbitrary? For that matter, what antitrust benefit would be gained by a rule that freezes prices at levels designed to produce "equal profit rates" using some historically based commission-approved system for allocating investment? Any such court involvement in the rate-setting process could easily discourage utilities from proposing, and commissions from considering, such innovative, economically based, energy-conserving pricing systems as off-peak pricing (charging higher prices for electricity used during peak periods), incremental-cost pricing

(charging prices for certain services reflecting the higher costs of hypothetical new construction), or even traditional Ramsay pricing (tailoring rates to reflect the comparative likelihood that higher rates will force customers to discontinue service); for there is no particular reason to believe that such rates would (or would not) reflect "equal" profits according to some particular prior, historical, commission-approved system for allocating investment. *See generally* 1 *A. Kahn* 87–103. At best, permitting judges and juries to speculate in this area would force regulators continually to revisit prior investment-allocation rules and would discourage regulatory efforts to develop (often with a utility's help) a set of economically rational pricing practices—which, after all, is a common objective of antitrust law and regulation.

Fifth and finally, a distributor who disagrees with the utility's, or the commission's, cost-allocation methods or with its rates, or who believes that a price squeeze will harm it (whether or not the price squeeze also harms the competitive process), has an administrative remedy. It can challenge a utility's rates and practices before the Commission as unjust, unreasonable, or "discriminatory." *See* 16 U.S.C. §§ 824d(a, b), 824e(a); 18 C.F.R. § 2.17(a) (1990). As part of its challenge, it can ask the Commission to consider the alleged price squeeze harm. *See FPC v. Conway,* 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976). If FERC permits the rates to take effect after suspension and later determines that a price squeeze exists, it can order an appropriate refund.

In sum, the relevant antitrust considerations differ significantly, in degree and in kind, when a price squeeze occurs in a fully regulated as opposed to an unregulated industry. Indeed, these considerations, which are closely balanced in the ordinary price squeeze, change so significantly when the squeeze takes place in a fully regulated industry that, in our opinion, the legal consequences of the squeeze change as well. That is to say, a price squeeze in a fully regulated industry such as electricity will not normally constitute "exclusionary conduct" under Sherman Act § 2.

We are aware that reported opinions in three circuit courts of appeal and several district courts suggest that a price squeeze may be unlawful in the regulated electricity industry. *See City of Kirkwood v. Union Elec. Co.,* 671 F.2d 1173 (8th Cir.1982), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983); *City of Groton v. Connecticut Light & Power Co.,* 662 F.2d 921 (2d Cir.1981); *City of Mishawaka v. American Elec. Power Co.,* 616 F.2d 976 (7th Cir.1980) (*Mishawaka II*), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981); *see also City of Newark v. Delmarva Power & Light Co.,* 467 F.Supp. 763 (D.Del.1979); *Borough of Ellwood City v. Pennsylvania Power Co.,* 462 F.Supp. 1343 (W.D.Pa.1979), *later proceeding,* 570 F.Supp. 553 (1983); *City of Batavia v. Commonwealth Edison Co.,* No. 76–C–4388, slip op. (N.D.Ill. Jan 16, 1984). In only one of those cases, however, did the court actually enter, or affirm, a judgment against the defendant; thus, there is extremely little case law *holding* that a public utility price squeeze is exclusionary. Moreover, in all of the cases we have cited, the price squeeze allegation was but one of several allegations of several different kinds of "exclusionary conduct," and the one court that affirmed a Sherman Act § 2 judgment against a utility stressed that it might well *not* have done so had the price squeeze stood alone (as it does in the case before us). *See Mishawaka II,* 616 F.2d at 986 (suggesting that "no one aspect [of the defendant's conduct] standing alone is illegal"). Further, in every case, the price squeeze allegation involved wholesale prices that *exceeded* retail prices, (a matter here in doubt), thereby eliminating some of the "administrative" problems we have found surrounding a jury's efforts to determine the reasonableness of the price "gap." *See City of Mishawaka I v. Indiana & Michigan Electric Company,* 560 F.2d 1314, 1316 (7th Cir.1977) (wholesale price to municipalities "substantially higher" than retail price to industrial customers, threatening municipalities with "financial extinction"); *City of Kirkwood,* 671 F.2d at 1176; *City of Groton,* 662 F.2d at

925; *City of Newark* 467 F.Supp. at 766; *Borough of Ellwood City* 570 F.Supp. at 557; *City of Batavia, supra.* Thus, technically speaking, our holding is consistent with these other cases. Indeed, since we cannot find significant evidence that Edison's price squeeze deprived plaintiffs of a "living profit" (for the plaintiffs earned substantial returns, and even increased their sales, during the price squeeze period), our holding is arguably a consistent application of the rule set forth in *Alcoa* itself.

Nevertheless, we recognize that our reasoning and analysis differs significantly from that in the opinions (other than *Alcoa*) just cited. We have carefully considered these differences and have found nothing to convince us that our analysis is incorrect. Even so, we have limited our holding by stating that "normally" a price squeeze will not constitute an exclusionary practice in the context of a fully regulated monopoly, thereby leaving cases involving exceptional circumstances for another day. And we have stressed that our reasoning applies with full force only when the monopolist who engages in the squeeze is regulated at both industry levels. We recognize that a special problem is posed by a monopolist, regulated at only one level, who seeks to dominate a second, unregulated level, in order to earn at that second level the very profits that regulation forbids at the first. *See* 3 *Areeda & Turner* ¶ 726e, at 217–20.

### III

#### Monopoly Power

■ A second, legally fatal problem with plaintiffs' case is that they failed to show that Boston Edison possessed monopoly power in the relevant market. As we have repeatedly pointed out, the traditional, *Alcoa*-type price squeeze occurs when a monopolist uses its control over the *monopolized* product (*e.g.*, ingot) to obtain a monopoly at a second industry level (*e.g.*, sheet). In this case, it is undisputed that Boston Edison has a (lawful) monopoly at one level of the electricity industry, namely transmission, for a given area normally can support only one transmission system, *see, e.g., Meeks*, 72 Colum.L.Rev. at 87, and Edison owns the transmission grid covering the area that includes Concord and Wellesley. The plaintiffs, however, cannot show (indeed, with one exception, they do not try to show) that Boston Edison used its control of electricity *transmission* to their disadvantage. To the contrary, the record clearly demonstrates that Boston Edison will "wheel" (*i.e.*, transmit) electricity from other producers to any distributor upon request, all for a nominal transmission charge that no one claims is unreasonably high. *See* Record Appendix at 1442, 1451–52, 1704–05 [hereinafter *App.*]. Indeed, Concord and Wellesley buy some of their electricity from the New York Power Authority, which wheels that electricity over Edison's lines, and at least half a dozen municipal distributorships use Edison's lines to obtain *all* of their electric power from non-Edison sources. *See App.* at 1449–50. Concord is a member of NE-POOL, all of whose members have interconnected lines, used to transfer electricity freely among them; and the record suggests that Wellesley is free to join NE-POOL should it wish to do so. The only arguably contrary evidence in the record consists of Concord's claim that Boston Edison refused to connect it to a 115 kv line; but the record does not (1) suggest that Concord needs that connection to buy electricity elsewhere, (2) indicate that the dispute concerns anything other than the connection price, or (3) show that the demanded connection price was unreasonably high.

At the same time, the record fails to show that Edison had monopoly power at the *generation* level, the industry level at which plaintiffs claim Edison charged too high a rate. To the contrary, the record shows that more than a dozen different power generating companies sell wholesale power in New England and that this power flowed freely among NEPOOL members. It shows that municipalities near Concord and Wellesley, municipalities to the north, south, east, and west of Concord and Wellesley, bought their electricity from production companies other than Boston

Edison. It shows that Boston Edison's electricity production accounted for less than 12% of the electricity produced by these New England utilities. These facts and figures suggest that Boston Edison is far from attaining the 70% to 90% of the sales in a well-defined marketplace that Judge Hand (and later commentators) thought indicative of monopoly power. *See, e.g., Alcoa,* 148 F.2d at 424 (stating that a 90% market share "is enough to constitute a monopoly" but that 60% is probably, and 30% is "certainly," not enough); *City of Mount Pleasant v. Associated Elec. Coop., Inc.,* 838 F.2d 268, 279–80 (8th Cir.1988) (electricity suppliers accessible via wheeling must be included in wholesale market); *Lopatka,* 31 U.C.L.A.L. Rev. at 611 (arguing that the geographic market for wholesale electricity "include[s] all generation sources from which the municipality could obtain power at relatively insubstantial wheeling costs").

In their efforts to show monopoly power at the generation level, the towns point to three pieces of evidence. First, they say that Concord had a study made "which concluded that it was not economically feasible for the Town ... to obtain its power requirements from non-Edison sources...." The study in question, however, says that "the reason" the town will have lower power costs in the long run by buying from Edison is that Edison's "rate is based on embedded resources which are lower priced than the new units with which" the town would have to "meet its power supply requirements" if it stopped buying from Edison. This "reason" does not show that Edison has monopoly power. It shows only that Edison can charge lower prices because it bought its generating equipment at older, cheaper prices, (rather like a wheat farmer who, having purchased unusually fertile land long ago, could now sell wheat at lower prices or earn higher profits than other farmers, even in a highly competitive wheat market). In a competitive market a firm that bought older, cheaper generating equipment would simply charge the higher prices that the cost of new, expensive equipment requires its competitors to charge and it would pocket

the difference. In a regulated market, the regulator forces the "historically lucky" firm to pass along some, or all, of this potential extra profit to its customers in the form of lower prices. In either case, the "extra" profit resulting from lower costs is not a monopoly profit. It is called an "economic rent." And its presence is consistent with a perfectly competitive marketplace. *See* 2 *Areeda & Turner* ¶ 510, at 33–34; P.A. Samuelson, *Microeconomics,* at 213–214, 635 (13th ed. 1989); G. Stigler, *The Theory of Price,* at 258–63 (4th ed.1987). Concord's study, which relates Edison's superior performance to cost advantages, is not evidence that Edison has market power.

Second, plaintiffs point to a provision in Edison's tariff that states that, if they wish to buy power from other firms, they must either (1) give Edison five years advance notice, or (2) compensate Edison for any adverse impact Edison suffers in the subsequent three years. We need not explain all the reasons why this provision does not show that Edison possesses monopoly power, however, because, at a minimum, the record does not show that the tariff either unreasonably, or significantly, limits a customer's ability to buy from others. To the contrary, the plaintiffs have bought power from non-Edison sources, namely the New York Power Authority, despite the provision. And the plaintiffs remain free to challenge before FERC any unreasonably high charge that Edison might try to assess under this provision.

Third, the plaintiffs argue that the kind of electricity supply service they need—a firm commitment by a generating source to supply their full requirements—was simply unavailable from any firm other than Edison; hence, Edison had "monopoly power" over the price of this particular kind of service. Plaintiffs offered three pieces of evidence to support this contention: (1) John O'Neil, superintendent of the Concord light plant, in response to the question, "Was there any other firm requirements power available for Concord to purchase from utilities other than Boston Edison?," answered, "Not to my knowledge, no, sir."

(2) Maurice Berdan manager of the Wellesley light plant, in response to the question, "Is there any other source of firm requirements wholesale power available to the Town of Wellesley other than Boston Edison Company?", answered (over an objection that the answer "appears to call for an expert opinion and/or for hearsay"), "We had consultants look at it, and I have also had discussions with other people in the industry that we have not found any other sources of power, firm requirements power, that would be available ..." and it was "public knowledge in the industry that firm requirements power is not available." (3) The minutes of the March 10, 1987 Concord Municipal Light Board meeting report,

A question was raised as to whether or not Concord could become a customer of New England Power. It was stated that the 'NEES Plan' does not include new large power loads; Princeton's request to return to all-requirements status was rejected.

We do not think this evidence sufficient to show that Edison possessed "monopoly power" with respect to "firm requirements" contracts to supply electricity. For one thing, we do not see how a reasonable juror could conclude from this testimony and minutes that no firm other than Edison would sell "firm requirements" electricity at a price that roughly reflected current production costs. After all, the record is filled with evidence that other municipal distributors bought electricity from other suppliers. Both town witnesses were testifying in the context of a report (discussed at p. 30, above) that said it was less *economical* for the towns to buy electricity elsewhere than from a utility that had especially low historical costs. Neither town witness had himself tried to obtain a "firm requirements" contract for electricity (indeed, Mr. O'Neill conceded that he had "never talked to another utility besides Boston Edison on behalf of Concord"). And neither town witness made clear either the specific basis for his conclusion, nor, for that matter, did either witness say that he meant it was *not possible* to find an alternative supplier at prices reasonably close to current costs of production. To the contrary, David Foote, an Edison witness, who worked for a group of New Hampshire utilities, stated that he had contacted three New England utilities (other than Edison) during the period in question and found that one of them would enter into a "firm requirements" contract to supply electricity.

For another thing, as we explained above, a simple showing that Edison offered a "firm requirements" contract (or any other type of contract) for power *more cheaply* than alternative suppliers does *not* show that Edison had monopoly power. Monopoly power is the power to raise price well above competitive levels before customers will turn elsewhere. *See generally* 2 *Areeda & Turner* ¶¶ 501–506, at 322–29. The plaintiffs' evidence shows neither that Edison's rates were significantly lower than the rates of others, nor that any such lower rates reflected anything other than lower costs; and the latter, as we explained earlier, is evidence only of an economic rent, not of monopoly power. *See* p. 30, *supra.* In the face of these economic facts, and other evidence in the record, the three pieces of evidence cited are simply too skimpy to support a "monopoly power" conclusion.

Finally, even though classical price regulation rests upon the premise that the regulated firm maintains a "natural monopoly," we resist any temptation to permit a jury to infer monopoly power from the mere fact of wholesale rate regulation itself. Whatever the historical basis for such regulation, today there is a growing conviction among students of the subject that the electricity generation business (as opposed to the transmission and distribution business) may be able to support several competing firms. *See, e.g.,* P. Joskow, *Regulatory Failure, Regulatory Reform and Structural Change in the Electric Power Industry* in *Brookings Papers: Microeconomics 1989* at 189–90 (1989); R. Pierce, *A Proposal to Deregulate the Market for Bulk Power*, 72 Va.L.Rev. 1183, 1212–15 (1986).

For these reasons, we do not believe plaintiffs met their burden of providing

evidence from which a jury could find that Edison had significant monopoly power in the relevant market, *i.e.*, the power to raise price significantly higher than the cost-based level that competition would otherwise bring about.

The judgment of the district court is

*Reversed.*

## APPENDIX A

We offer the following highly simplified intuitive explanation of the "single monopoly profit" argument, based upon an example given by Professors Areeda and Turner.

Assume that copper is used only to produce pipe. Assume that the industry has two "levels:" (1) refining ore into copper ingot and (2) fabricating ingot into pipe. Assume the profit-maximizing price for copper pipe is $100. (Charging more would reduce pipe sales to the point where the monopolist would earn less profit; charging less would increase pipe sales, but not enough to make up for lost potential revenue on each sale.) Assume the cost (including a reasonable profit) of refining ore into ingot is $40. Assume the cost of fabricating ingot into pipe is $35.

Suppose that the "ingot" stage of the industry is monopolized but the "pipe" stage is competitive. An ingot monopolist would charge $65 for its ingot; it would rely upon competition among pipe fabricators to keep the mark-up at $35 and the fabricated-pipe price at $100; and it would pocket $25 ($65 minus $40) of monopoly profit.

Suppose, instead, that the "ingot" stage of the industry is competitive but the "pipe" stage is monopolized. Competition at the "ingot" stage would produce an ingot price of $40. The pipe monopolist would buy the ingot for $40; it would sell the fabricated pipe for $100; and (after subtracting the $40 cost of ingot and $35 cost of fabrication) it would pocket $25 of monopoly profit.

Now suppose a single, integrated firm managed to achieve a monopoly at *both* "levels" of the industry. It would sell pipe at the profit-maximizing price of $100. After deducting its total costs ($40 plus $35), it would pocket $25 of monopoly profit.

In each case, the profit-maximizing price remains $100 and the monopoly profit is $25. This normally will remain so as long as the manufacturing costs associated with ingot and pipe remain the same.

*See* 3 *Areeda & Turner* ¶ 728b, at 199.

## APPENDIX B

This is a graphic and a numerical example offered to help provide an intuitive understanding of the possible price effect of having two separate monopolists at two different industry levels.

Price / Quantity graph showing demand (D), marginal revenue (MR), supply (S) curves with points labeled.

| Price | Quantity | Total revenue | M's costs | M's profits | R's costs | R's profits |
|-------|----------|---------------|-----------|-------------|-----------|-------------|
| 10 | 1 | 10 | 1 | 9 | 6 | 4 |
| 9 | 2 | 18 | 2 | 16 | 12 | 6 |
| 8 | 3 | 24 | 3 | 21 | 18 | 6 |
| 7 | 4 | 28 | 4 | 24 | 24 | 4 |
| 6 | 5 | 30 | 5 | 25 | 30 | 0 |
| 5 | 6 | 30 | 6 | 24 | 36 | [negative] |
| 4 | 7 | 28 | 7 | 21 | ... | ... |
| 3 | 8 | 24 | 8 | 16 | ... | ... |
| 2 | 9 | 18 | 9 | 9 | ... | ... |
| 1 | 10 | 10 | 10 | 0 | ... | ... |

It costs $1 to make a widget.

A single monopolist ("M") will maximize his profit by setting a price of $6 and selling 5 widgets. His profit is $25 (represented by the area "rstu").

If M sells widgets for $6 each to an independent retailer ("R") with monopoly power, R will maximize *his* profit by setting a price of $8 and selling 3 widgets. His profit is 6 (represented by the area "rhgf").

M's best strategy is enter the retailing level of the industry and to set a final price of (roughly) $6.