**TOWN OF NORWOOD, Massachusetts,**
**Plaintiff,**

v.

**NEW ENGLAND POWER COMPANY,**
**New England Electric System, Pacific**
**Gas & Electric Company and PG & E**
**Corporation, Defendants.**

**Civil Action No. 97–10818–PBS.**

United States District Court,
D. Massachusetts.

Sept. 28, 1998.

Alan K. Posner, Kenneth M. Barna, Rubin & Rudman, Boston, MA, Charles F. Wheatley, Jr., Wheatley & Ranquist, Annapolis, MD, for Town of Norwood.

David H. Erichsen, Harold Hestnes, Peter A. Spaeth, Vinita Chopra, Rebecca L. Fine, Hale & Dorr, Boston, MA, Edward Berlin, Swidler & Berlin, Washington, DC, for New England Power Co.

George B. Dean, Office of the Attorney General, Boston, MA, for Attorney General, MA.

Alan M. Shoer, Office of the Attorney General, Providence, RI, for the state of Rhode Island.

David H. Erichsen, Harold Hestnes, Peter A. Spaeth, Vinita Chopra, Hale & Orr, Boston, MA, for New England Electic Systems.

Steven W. Phillips, Richard M. Brunell, Foley, Hoag & Eliot, Boston, MA, for U.S. Generating Co., Pacific Gas & Electric Co.

*MEMORANDUM AND ORDER ON MOTIONS TO DISMISS*

SARIS, District Judge.

This action asserts antitrust and breach of contract claims arising from the comprehensive restructuring of the electric utility industry. The Town of Norwood, Massachusetts ("Norwood") distributes electricity to businesses and residences within its borders. Until recently, Norwood purchased all of its wholesale power requirements from defendant New England Power Company ("NEPCO") pursuant to a long-term contract which arose from a 1983 settlement of an antitrust suit approved by another judge of this Court. The current dispute was sparked when NEPCO, as part of 1996 settlements with the Massachusetts and Rhode Island governments, agreed to sell virtually all of its nonnuclear generation facilities, and to assign wholesale supply contracts with two of its affiliates to the U.S. Generating Company ("USGen"). While NEPCO's retail affiliates were charged market-based wholesale power rates under these assigned contracts, NEPCO was charging cost-of-service rates under its tariff to Norwood and others.

Seeking to enjoin the divestiture and challenging the resulting rate differential, Norwood filed this suit. Subsequently, the Federal Energy Regulatory Commission ("FERC" or the "Commission"), on NEPCO's application, approved the state settlements, divestiture, contract assignments and new rate schedules over Norwood's objections. Norwood reacted to FERC's approval by terminating its contract with NEPCO and signing a long-term wholesale power supply contract with Northeast Utilities Service Company ("NUSCO"). NEPCO, in turn, asked FERC to approve a "contract termination charge" as an amendment to the tariff applicable to Norwood. FERC approved the charge, again over Norwood's objection. In the meantime, Norwood has twice amended its complaint here.[1] All defendants move to

1. Norwood's first amended complaint added NEPCO's parent, New England Electric System ("NEES"), the purchaser of the generation assets, U.S. Generating Company ("USGen"), and

USGen's parent, Pacific Gas & Electric Company. Norwood's Second Amended Complaint dropped USGen as a defendant, added PG & E Corporation, and made several substantive

dismiss on several grounds, including the preclusive effect of the "filed rate doctrine" in matters pertaining to prices for the wholesale supply of power. After two hearings on the matter, the motions to dismiss are **ALLOWED**.

### BACKGROUND

■ In considering defendants' motion to dismiss, the Court takes as true all allegations in the complaint and makes reasonable inferences in the plaintiff's favor. *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993). In addition to the allegations contained in the four corners of the complaint, the Court considers materials attached to the complaint and matters of public record, including submissions to and decisions of the FERC. *See id.* (permitting consideration of "official public records" without requiring the conversion of a motion to dismiss into a motion for summary judgment). However, the Court does not consider the affidavits submitted by parties.

#### 1. *The Industry*

Three major vertical stages exist in the electric utility industry: (1) power production, which is the generation of electricity; (2) the transmission of high voltage electric power from the points of generation to substations for conversion to delivery voltages; and (3) the distribution of low voltage electricity to individual homes and businesses. *See Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 19–20 (1st Cir.1990) (describing the organization of the industry).

Under state authority, *see* Mass.G.L. c. 164, §§ 34 *et seq.* (1997), Norwood owns and operates an electric distribution system which supplies power to its retail customers, almost all of which are businesses and households located in the town. Since Norwood provides only distribution services, it is dependent on other companies to generate or otherwise supply power and then to transmit it via high-voltage lines from the generators to Norwood's local distribution network.

Generation and transmission services in New England have historically been performed by vertically-integrated investor-owned utilities.

Defendant NEPCO is a generation subsidiary of one such utility, defendant New England Electric System ("NEES"). Though some distribution systems in Massachusetts and other New England states are run by municipalities like Norwood, most are owned by vertically-integrated utilities that provide generation and transmission services. NEES is also the parent of two such retail distribution utilities, Massachusetts Electric Company ("Mass.Electric") and Narragansett Electric Company ("Narragansett"). Mass. Electric serves retail customers in Massachusetts, and Narragansett serves retail customers in Rhode Island. In other words, NEPCO has historically sold power that it generates both to municipalities like Norwood and to investor-owned utilities, including its own affiliates.

#### 2. *The Antitrust Settlement and Court Order*

The story begins in 1974, when Norwood brought an antitrust suit against NEPCO before another judge of this Court. At the time, Norwood received both generation and transmission services from Boston Edison Company, another large vertically-integrated utility. Norwood claimed that NEPCO refused to deal with Norwood and that Boston Edison refused to "wheel" power from NEPCO in violation of the Sherman Act. 15 U.S.C. §§ 1–2. It complained that NEPCO refused to sell firm requirements wholesale power to Norwood under its tariff (Tariff 1) at the same rates that it was charging Mass. Electric and Narragansett. These two affiliates were parties with NEPCO to "wholesale requirements contracts," meaning that NEPCO ensured they were supplied all of the power they needed from either NEPCO-owned generators or power pool supplies available to NEPCO.

On April 12, 1983, NEPCO and Norwood settled the case, and the settlement agree-

---

changes. It asserts claims for breach of contract approved by antitrust decree and order (Count I); violation of Section 7 of the Clayton Act, 15 U.S.C. § 18 and Section 1 of the Sherman Act,

15 U.S.C. § 1 (Count II); violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count III); and violation of Section 3 of the Clayton Act, 15 U.S.C. § 14 (Count IV).

ment was entered as a Court decree. By the settlement, the parties entered into a power contract in which NEPCO agreed to "provide all-requirements electric service to Norwood under NEP[CO]'s FERC Tariff," (Power Contract, Article I), and to sell 100 percent of Norwood's electric requirements until October 31, 1998, the end of the contract term, at its "Tariff 1" rate. (Power Contract, Article IV.) This tariff rate, which NEPCO also charged its affiliates, was filed with and approved by the FERC. The parties agreed at the time that "[n]either NEP[CO] nor Norwood has a present intention to terminate all-requirements service." (Power Contract, Article IIIB.) The parties also agreed not to give a notice of termination prior to November 1, 1991, and not to specify a termination date prior to November 1, 1998. (Power Contract, Article IIIB; *see also* Settlement Agr'mt. ¶ 4.6.) In 1989, Norwood exercised its contractual option to extend its contract with NEPCO until October 31, 2008.

### 3. *Restructuring the Industry*

Nationally, both state and federal authorities have initiated reforms to make the electric industry more competitive and to implement retail consumer choice. One of the principal means of increasing competition is to break up the vertically-integrated utilities, forcing the separation of the power supply function of generation from the delivery functions of transmission and distribution. The state and federal governments have played interdependent roles in a vast restructuring in New England. The states regulate the retail distribution of electricity occurring within their borders, including the prices charged to households and businesses by distribution systems. The Rhode Island legislature passed the Rhode Island Utility Restructuring Act of 1996, which calls for a restructuring of the industry in order to implement a program of consumer retail choice. *See* R.I. Gen. Laws §§ 39–1–1 *et seq.* (1996). Among other things, the plan calls for the "unbundling" of the three stages of the power delivery system, meaning distribution companies have to allow different power sup-

ply companies access to their retail customers. *See id.* § 39–1–27.3.

The Massachusetts Attorney General took similar action in proceedings before the Massachusetts Department of Public Utilities in 1996.[2] On November 25, 1997, after the precipitating events of this case had taken place, the Massachusetts Legislature passed a law requiring electric companies "to accommodate retail access to generation services and choice of suppliers by retail customers." Mass.G.L. c. 164, § 1A (1997). Municipal light companies have not been required to allow competitive choice of generation supply within their borders. *See id.* § 47A(a).

Generation and transmission, which have interstate implications, are regulated at the federal level by the FERC. On April 24, 1996, the FERC issued its report on several final rules known collectively as Order No. 888, the goal of which was "to remove impediments to competition in the wholesale bulk power marketplace and to bring more efficient, lower cost power to the Nation's electricity consumers." Promoting Wholesale Competition Through Open Access Non–Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, 61 Fed.Reg. 21,540 (1996) (rule codified at 18 C.F.R. pts. 35 & 385) [hereinafter Order No. 888].

NEPCO was involved in the industry restructuring efforts of both the Rhode Island and Massachusetts governments. In 1996, the NEES companies (NEPCO, Mass. Electric and Narragansett) reached a settlement agreement with Massachusetts and Rhode Island regulators to implement retail choice programs in the two states. Under this settlement with the states, to which Norwood was not a party, NEPCO agreed, among other things, to divest itself of its non-nuclear generation facilities and to terminate its wholesale power purchase contracts with its retail affiliates, subject to contract termi-

---

**2.** The Massachusetts Department of Public Utilities is now named the Department of Telecom-

munications and Energy.

nation charges,[3] and transfer those contracts to another utility. The Massachusetts Attorney General, NEPCO, and twelve other interested entities filed the settlement agreement with the FERC on September 30, 1996, and NEPCO promised to notify the FERC of the details of the execution of the plan no later than October 1, 1997. Norwood timely moved to intervene in FERC proceedings on the settlement on December 31, 1996.

### 4. This Litigation

On April 14, 1997, Norwood filed the original complaint in this lawsuit solely against NEPCO in an attempt to block the proposed divestment of its assets. The town moved for a preliminary injunction and for summary judgment, and NEPCO moved to dismiss. The Court heard all three motions on September 8, 1997 and denied both of Norwood's motions from the bench. NEPCO's motion to dismiss was taken under advisement, but the following factual developments precluded a decision on the motion last year.

On October 1, 1997, NEPCO filed notice with FERC that it had agreed to sell its non-nuclear generation assets to USGen, a wholly-owned subsidiary of Pacific Gas & Electric Company ("PG & E"),[4] and asked for the Commission's approval. In the filing, NEPCO requested approval of the assumption by USGen of NEPCO's power sales to Mass. Electric and Narragansett at so-called "Standard Offer Service" rates, which differed from NEPCO's Tariff 1 rates. USGen and NEPCO also requested approval of "market rate tariffs" for future transactions. Letter from NEPCO's Counsel to FERC Secretary of 10/1/97. As a result, Norwood amended its complaint on November 21, 1997, adding NEES, USGen, and PG & E as defendants. NEPCO renewed its motion to dismiss the First Amended Complaint, and USGen and PG & E moved to dismiss as well.

NEPCO soon secured all necessary approvals from FERC for its settlements and for its transfer of generation assets and pow-

er contracts to USGen. On November 26, 1997, over Norwood's objections, FERC approved NEPCO's settlements with Mass. Electric, Narragansett, and the states. See New England Power Co., 81 FERC ¶ 61,281 (1997) (letter order conditionally approving settlements); New England Power Co., 83 FERC ¶ 61,265 (June 3, 1998) (order denying Norwood's request for rehearing). On February 25, 1998, FERC approved the sale of the generation facilities and the assignment of the wholesale power service contracts to USGen. The FERC also approved the new market-based rates which would be implemented, subject to NEPCO's agreement to freeze rates to existing customers (like Norwood), even if NEPCO ends up paying more for replacement power than it currently charges wholesale customers. See New England Power Co., 82 FERC ¶ 61,179 (1998); New England Power Co., 83 FERC ¶ 61,275 (June 10, 1998) (order on clarification and rehearing). Norwood has since petitioned the First Circuit for review of both of these Commission decisions pursuant to 16 U.S.C. § 8251(b). See Town of Norwood v. FERC, 81 FERC ¶ 61,281 (1997) & 83 FERC ¶ 61,-365 (1998), appeal docketed, 234 Ga.App. 18, 505 S.E.2d 562 (1st Cir.1998) (settlement with affiliates and states); Town of Norwood v. FERC, 82 FERC ¶ 61,179 (1998); Town of Norwood v. FERC, 83 FERC ¶ 61,275 (1998), appeal docketed, CA 98-1876 (1st Cir. July 1, 1998) (asset transfer).

Because the rates offered to Norwood under Tariff 1 were substantially higher than the rates NEPCO offered to its affiliates, Norwood alleges it was subjected to a 20 percent higher price for the same wholesale power service, and, thus, was effectively precluded from competing. (Sec.Am.Comp.¶ 6.) After the approvals of the merger and new rates by FERC, Norwood, claiming a "duty to mitigate damages," boldly took matters into its own hands. By letter of March 4, 1998, the town terminated its contract with

---

**3.** According to NEPCO, the negotiated "contract termination charge" reflects the retail affiliate's share of the unrecovered costs of NEP's generating plants, reduced by the proceeds from the sale of these plants.

**4.** As part of a corporate reorganization in 1997, PG & E Corporation became the parent of Pacific Gas & Electric Company. For purposes of this opinion, the collective entity is referred to as "PG & E."

NEPCO effective April 1, 1998. On March 3, 1998, after considering bids from five wholesale providers, Norwood had signed a firm wholesale power contract with NUSCO effective the day of FERC approval of the USGen divestiture (February 25, 1998) until December 31, 2008. On March 24, 1998, NUSCO filed the contract and rate schedule pursuant to § 205 of the Federal Power Act, 16 U.S.C. § 824(e), and FERC accepted the submissions for filing. *See NU Operating Cos.,* FERC Dkt. No. ER98–2301–000 (Apr. 22, 1998) (letter order). NEPCO responded by requesting an amendment to Tariff 1, permitting its Tariff 1 customers the option of terminating service early subject to the payment of a contract termination charge ("CTC"). (Docket 83.) Those CTCs, a critical element of the restructuring of the industry at the federal level, were accepted for filing by FERC on May 15, 1998. *See New England Power Co.,* 83 FERC ¶ 61,174 (1998).[5] The FERC, just weeks ago, denied Norwood's request for rehearing on the subject of the CTCs. *See New England Power Co.,* 84 FERC ¶ 61,175 (Aug. 5, 1998). Norwood contends that this amendment requires it to pay $52 million in contract termination costs for its early termination.

Norwood submitted a Second Amended Complaint to the Court on April 29, 1998, updating the language of the allegations and dropping USGen as a party. The Second Amended Complaint contains four counts, alleging a breach by NEPCO of the 1983 settlement agreement with Norwood and antitrust violations.

## DISCUSSION

NEPCO, joined by NEES, moves to dismiss Norwood's complaint on the basis of the filed rate doctrine, exhaustion, primary jurisdiction, and failure to state a claim. PG & E joins these bases and additionally asserts that the complaint fails to state a claim against it since it is merely the parent of USGen. The Court needs only to address the issue of the filed rate doctrine, which is dispositive.

### A. *The Filed Rate Doctrine*

The Federal Power Act ("FPA") governs "the transmission of electric energy in interstate commerce and . . . the sale of electric energy at wholesale in interstate commerce . . . ." 16 U.S .C. § 824(b)(1). The FERC has jurisdiction "over all facilities for such transmission or sale of electric energy," excluding local distribution and exclusively intrastate transmission. *Id.* Congress assigned the FERC several responsibilities regarding its jurisdiction over electric facilities that are relevant to this case. First, § 203 of the FPA prohibits sale of facilities subject to FERC jurisdiction by public utilities without permission of the Commission, which must approve any such dispositions that are "consistent with the public interest." 16 U.S.C. § 824b(a); *Northeast Utilities Service Co. v. FERC,* 993 F.2d 937, 947 (1st Cir.1993). Second, § 205 of the FPA requires the FERC to ensure that generation and transmission services rates and charges, which public utilities must file with the Commission, are "just and reasonable." 16 U.S.C. § 824d(a). Third, § 206 of the FPA requires that the FERC provide procedures for entities to challenge the regulated practices of a public utility. *See* 16 U.S.C. § 824e.

As background, the century-old "filed rate" doctrine is not an antitrust concept but derives from the more general public utility rule that "the rate of the carrier duly filed is the only lawful charge and [d]eviation from it is not permitted upon any pretext." *AT&T v. Central Office Telephone, Inc.,* —— U.S. ——, 118 S.Ct. 1956, 1962, 141 L.Ed.2d 222 (1998) (quoting *Louisville & Nashville R. Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 59 L.Ed. 853 (1915)). The strict application of the rule is necessary to pro-

5. As provided in FERC Order No. 888, under the "revenues lost approach" for calculating stranded costs, the CTCs would compensate NEPCO the difference between the revenues it would have received under the contract term and the estimated market value of the "released capacity and energy." *Id.* at 6. This proposed formula differs from that applicable to the affiliates, which entered into "negotiated agreements." NEPCO stated to FERC it would be willing to negotiate similar termination agreements with Norwood.

mote the congressional policy of preventing "unjust discrimination" in rates. *Id.*

 Under the "filed rate doctrine," the FERC's authority to determine whether wholesale rates filed by utilities are "just and reasonable" is exclusive. *See Mississippi Power & Light Co. v. Mississippi,* 487 U.S. 354, 371, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988); *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 966, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). Public utilities cannot charge rates for their services "other than those properly filed with the appropriate regulatory authority." *Arkansas La. Gas Co. v. Hall,* 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). Unless the filed rates "are challenged, either by an interested party or on the Commission's initiative, the filed rates become legal rates." *Boston Edison Co. v. FERC,* 856 F.2d 361, 368 (1st Cir.1988) (quotation omitted). Parties "aggrieved" by an order of the FERC may obtain review of the decision from the United States Court of Appeals. *See* 16 U.S.C. § 8251(b); *Northeast Utils.,* 993 F.2d at 943–44.

 Since the filed rate doctrine vests rate approval exclusively in FERC, subject to direct appellate review, it necessarily follows that a federal district court cannot make its own determination of what rate is "just and reasonable." "It is now settled that 'the right to a reasonable rate is the right to the rate which the Commission files or fixes, and, ... except for review of the Commission's orders, [a] court can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one." *Mississippi Power,* 487 U.S. at 371, 108 S.Ct. 2428 (quoting *Nantahala,* 476 U.S. at 963–64, 106 S.Ct. 2349) (other quotations omitted); *see also Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17, 18 (2d Cir.1994) (holding that filed rates are "per se reasonable and unassailable in judicial proceedings brought by ratepayers"). "This principle binds both state and federal courts ...." *Mississippi Power,* 487 U.S. at 371, 108 S.Ct. 2428.

 The filed rate doctrine is applied "out of deference to a 'congressional scheme of uniform regulation'" in order to avoid "impermissibly 'usurp[ing] a function that Congress has assigned to a federal regulatory body.'"[6] *County of Stanislaus v. Pacific Gas & Elec. Co.,* 114 F.3d 858, 862 (9th Cir.1997) (quoting *Arkansas La. Gas,* 453 U.S. at 579 & 582, 101 S.Ct. 2925), *petition for cert. filed,* —— U.S. ——, 118 S.Ct. 854, 139 L.Ed.2d 754 (1998). It preserves "the exclusive role of federal agencies in approving rates for ... services that are 'reasonable' by keeping courts out of the ratemaking process ..., a function that the federal regulatory agencies are more competent to perform." *Marcus,* 138 F.3d at 58.

 The filed rate doctrine precludes contract and tort claims in state and federal court when those claims implicate the exclusive rate-approval role of FERC. *See Central Office,* —— U.S. at ——, 118 S.Ct. at 1963 (holding that the filed rate doctrine applies to action challenging services and billing rather than rates or rate setting because rates "do not exist in isolation" and have meaning "only when one knows the services to which they are attached"). The doctrine is "not limited to 'rates' per se" but rather applies when a plaintiff asks for relief of a kind that "directly affects" wholesale rates that have been filed with FERC for a particular service. *Nantahala Power,* 476 U.S. at 966–67, 106 S.Ct. 2349 (holding that, generally speaking, a FERC order allocating power could not be interfered with by a state court reallocation under filed rate doctrine); *see also Florida Mun. Power Agency v. Florida Power & Light Co.,* 64 F.3d 614, 616 (11th Cir. 1995) ("[I]f there was a filed rate covering network service, the damage claim would be precluded by the filed rate doctrine.").

 Even if plaintiff's complaint refers to some underlying or distinct conduct, "[t]he filed rate doctrine prohibits a party from recovering damages measured by comparing the filed rate and the rate that might

---

6. The filed rate doctrine applies not only in energy regulation but in other industries in which filing of rates or tariffs is required by law. *See, e.g., Marcus v. AT&T,* 138 F.3d 46, 58 (2d Cir. 1998) (telecommunications); *Square D Co. v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 422, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986) (shipping).

have been approved absent the conduct in issue." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 488 (8th Cir.1992); *see also Wegoland*, 27 F.3d at 19. As a result, "[a]pplication of the filed rate doctrine in any particular case is not determined by the culpability of the defendant's conduct, . . . the possibility of inequitable results" or "the cause of action the plaintiff seeks to bring." *Marcus*, 138 F.3d at 58. Instead, the doctrine is prudentially applied to exclude from trial court consideration complaints that would require interference with congressionally created federal regulatory processes.

### B. *Norwood's Claims*

Norwood's complaint contains one count for breach of contract and three antitrust counts. Although the thrust of its claims has changed in this fast-forward regulatory picture, at the root of all four counts is the claim that the rates and charges approved by FERC as part of NEPCO's settlements and divestiture plan undermine Norwood's competitive viability. Norwood alleges that NEPCO breached its contract with the town by divesting its non-nuclear generation assets, but the damage it asserts is that Norwood is now forced to pay certain wholesale rates and contract termination charges, approved by FERC, that differ from the rates and charges of NEPCO's affiliates, which were also approved by FERC. The three antitrust claims assert four theories of liability under the Sherman and Clayton Acts: (i) that the acquisition of assets by USGen tends "to create a monopoly in the generation and distribution markets" which will artificially raise wholesale prices in New England; (ii) that the fixed rates to be offered by agreement to NEPCO's affiliates by USGen will lead to "lucrative monopoly profits over time"; (iii) that the same acquisition and rate-setting agreement constitutes a "price squeeze"; and (iv) that the imposition of CTC's or stranded costs restricts Norwood from the market for competitive power supply.

### 1. *Antitrust*

■ The filed rate doctrine requires dismissal of the complaint's antitrust counts be-cause it explicitly covers antitrust claims that pin their alleged damages on unfair rates. A plaintiff cannot maintain a claim for damages in district court "on a claim that the rate was the product of an antitrust violation." *Florida Mun. Power Agency*, 64 F.3d at 616 (remanding for factual determination of whether there was a filed rate covering the particular service); *see also County of Stanislaus*, 114 F.3d at 863 ("[T]he filed rate doctrine precludes antitrust claims seeking damages on the basis of filed rates.").

■ Norwood essentially claims that the FERC-approved market-based rates charged to NEPCO's affiliates and the contract termination charges are the product of antitrust violations, a claim prohibited by the filed rate doctrine because it would ultimately require the Court to assess a just and reasonable rate. *See County of Stanislaus*, 114 F.3d at 867 (affirming motion to dismiss). Since the "legal" rate is the one filed with FERC, Norwood cannot claim an antitrust injury, or seek treble damages, based on the assertion that the rate is illegally high or improper. *See Square D*, 476 U.S. at 416–17, 106 S.Ct. 1922 (affirming dismissal of antitrust action in the shipping industry).

Norwood makes two arguments in an effort to avoid dismissal under the filed rate doctrine. First, the town points out that "[i]t is undisputed that utilities are 'not immune' from antitrust laws" and that district courts maintain jurisdiction over the antitrust laws, even in cases involving public utilities. *Northeast Utils.*, 993 F.2d at 946 (quoting *Otter Tail Power Co. v. United States*, 410 U.S. 366, 372–75, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973)); *see also Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 22–23 (1st Cir.1990) (pointing out that antitrust analysis must be "sensitive" to the legal and economic setting of the regulated industry). Norwood further stresses that Congress, in enacting the Energy Policy Act of 1992, recently reconfirmed its commitment to the application of antitrust principles to electric utilities by enacting an "antitrust savings clause" that FERC's expanded jurisdiction over wheeling "shall not be construed to modify, impair, or supersede the antitrust laws." 16 U.S.C. § 824e(2). Norwood particularly emphasizes

the following language from the First Circuit:

Petitioners may rest assured that were FERC to approve a merger of utilities which ran afoul of Sherman Act or other antitrust policies, the utilities would be subject to either prosecution by government officials responsible for policing the antitrust laws, or to suit by private citizens meeting the requirements of standing.

*Northeast Utils.*, 993 F.2d at 948 (citing *Otter Tail*, 410 U.S. at 374–75, 93 S.Ct. 1022).

However, Norwood's "no-immunity" argument misses the mark. The cases it points to as examples of federal district courts entertaining antitrust suits in the power industry in spite of the filed rate doctrine do not involve wholesale rates filed with the FERC. *See Town of Concord*, 915 F.2d at 20–21 (rejecting claim of an antitrust violation involving a price squeeze in the state-regulated *retail* electric business following a wholesale price increase that had been approved by FERC and was *not* challenged in the court case); *Otter Tail*, 410 U.S. at 374–75, 93 S.Ct. 1022 (rejecting antitrust immunity in a case involving a power company's refusal to deal with municipalities); *Northeast Utils.*, 993 F.2d at 943–44 (reviewing FERC order under 16 U.S.C. § 825l rather than an appeal from a district court).

■ The rule that utilities are not immune from court enforcement of the antitrust laws, as stated in the *Northeast Utilities*, is not inconsistent with the filed rate doctrine. Courts may entertain antitrust suits involving the electric industry in matters not affecting FERC-filed rates or charges. *See, e.g., Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 111 F.3d 1427, 1446 (9th Cir.1996) (filed rate doctrine does not apply to antitrust claim of blocking a competitor's entry into market using a covenant not to compete), *cert. denied*, —— U.S. ——, 118 S.Ct. 1688, 140 L.Ed.2d 824 (1998). However, when FERC-approved rates and charges are, as here, *the* subject matter of the suit, FERC's judgment prevails, subject to appellate review. *See Nantahala Power*, 476 U.S. at 966–67, 106 S.Ct. 2349; *Marcus*, 138 F.3d at 58–59.

Second, Norwood contends that the filed rate doctrine does not apply to its claims because the FERC only controls "cost-based" wholesale rates as opposed to the "market-based" wholesale rates which are now being allowed. While reliance on the filed rate doctrine as a bright prudential line may be on weaker footing as the electric utility industry returns to the marketplace, no obituary is in order.

■ When faced with concerns about the monopoly power of a utility, "FERC only approves market-based rates when a utility demonstrates that its market power is sufficiently mitigated in the relevant markets." *Cajun Elec. Power Co-op. v. FERC*, 28 F.3d 173, 176 (D.C.Cir.1994) (reviewing FERC procedures for approving market-based rates); *see also Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 370 (D.C.Cir.1998) (affirming FERC's approval of a provider's application to sell electricity at market-based rates in lieu of cost-of-service regulation where there was a competitive market). An aggrieved party can file a complaint with the FERC for any abuses of market power. *See Louisiana Energy & Power*, 141 F.3d at 370–71.

In this case, FERC stated it permitted power sales at market-based rates only after determining that the seller and its affiliates do not have, or have adequately mitigated, market power in generation and transmission and cannot erect other barriers to entry. *New England Power Co.*, 82 FERC ¶ 61,179 at 14 (1998). Further, the FERC has not abdicated its regulatory role with respect to the tariff charges imposed on Norwood about which Norwood complains most vehemently. When the FERC approved the settlements of NEPCO, its affiliates, and the states of Rhode Island and Massachusetts, the Commission explicitly rejected an attempt by the settlors to restrict the FERC's ability to review whether CTCs were "just and reasonable" on a challenge under § 206 of the Federal Power Act. *See New England Power*, 81 FERC ¶ 61,281 (1997) (letter order) ("A settlement may not restrict the rights of non-settling parties to apply to the Commission for changes in rates pursuant to Section 206 under a 'just and reasonable' standard.").

The FERC insisted, as it must, that its jurisdiction to review all rates and charges would continue to be governed by the statutory standard of consistent with the "public interest." *See id.*

### 2. *Breach of Contract*

Norwood contends that the filed rate doctrine does not preclude an adjudication by this Court of whether NEPCO, through its sale of assets, breached its 1983 court-approved settlement agreement with Norwood. In its recent opinion approving the contract termination charges, the FERC wrote:

> The fact that Norwood is litigating in court the issue of whether NEPCO's voluntary divestiture of its non-nuclear generation facilities constituted a breach of contract on NEPCO's part does not affect NEPCO's right to seek from this Commission an early termination exit fee amendment for its tariff of general applicability.

*New England Power Co.*, 83 FERC ¶ 61,174 (1998).

 Arguably, to the extent the breach of contract claims directly implicate FERC-approved rates and charges, the filed rate doctrine may collide head-on with jurisdiction over the court-approved settlement. Treading gingerly, I conclude that the claim of breach of contract fails as a matter of law for two reasons. First, Norwood has not alleged any facts from which this court could reasonably infer a violation of the Settlement Agreement, the Power Contract or this court's decree and order. These require NEPCO to charge Norwood the rates in its tariff of general applicability, Tariff 1, as amended by FERC. Norwood argues that NEPCO's divestiture of its generation portfolio and termination of Tariff 1 Service to its larger distributor affiliates, which account for over ninety-five percent of Tariff 1 service, facilitate the affiliates' access to market-based rates and preclude NEPCO from its obligation to provide all requirements electric service to Norwood under Tariff 1 on a cost of service basis, "*under equal wholesale rates to those provided by NEP [CO] to its affiliates.*" (emphasis added). The problem with this argument is that the underlined language does not appear in the contracts or

court order. While the "parol evidence rule does not preclude consideration of background facts that explain the context in which [an] agreement was made," where an integrated contract is not ambiguous, no extrinsic language can be used to "vary or modify its meaning." *SAPC v. Lotus Development Corp.*, 921 F.2d 360, 361–62 & n. 2 (1st Cir.1990).

Norwood next argues that NEPCO violated the agreement by imposing pre-divestiture "frozen rates" rather than actual post-divestiture cost-of service rates. Again, the contract merely requires NEPCO to impose Tariff 1 rates but does not specify how the Tariff must be calculated by FERC. Finally, Norwood argues it has the contractual right to withdraw its election to extend the Settlement Agreement because the premise for that election was that "neither NEP nor Norwood has a present intention to terminate all requirements service." (Settlement Agrmt. ¶ 4.6.) There is no allegation in the complaint that the representation was fraudulent. Moreover, NEPCO continued to be willing to provide Norwood with all-requirements service, and there is no contractual provision requiring NEPCO to provide all requirements service to its affiliates.

 Second, the essence of Norwood's bitterness is that the changed circumstances of the divestiture of the power generation facilities and contracts by NEPCO make it "manifestly illegal and unfair" to hold Norwood to its ten-year extension of the contract. The FERC has already resolved this problem by allowing Norwood to break this contract and negotiate for a new power supply. While Norwood challenges the imposition of stranded costs in the amended tariff, this challenge sweeps the parties into the vortex of the filed rate doctrine, which precludes the award of breach of contract damages under state law during a period that a defendant is subject to the jurisdiction of the FERC. *See Arkansas La. Gas Co.*, 453 U.S. at 584, 101 S.Ct. 2925. Even if a rate were filed in violation of a contract, the filed rate doctrine would still bar a court from awarding damages based on the difference between two rates. *See id.* at 582 n. 12, 101 S.Ct. 2925.

In sum, FERC has acted extensively on all three matters from which Norwood seeks damages: (i) NEPCO's sale of non-nuclear assets to USGen/PG & E; (ii) the agreement to "standard offer service" rates for Mass. Electric and Narragansett; and (iii) the assessment of contract termination charges on Norwood due to its early termination of wholesale supply service from NEPCO. In each case, FERC has heard objections from Norwood and others protesting the approval of the sales and rates. Also in every case, FERC, in detailed published opinions, has rejected Norwood's arguments, which have included complaints about the anti-competitive effects of NEPCO's actions. Norwood has appealed to the First Circuit, which is the best forum to resolve whether FERC's public interest analysis lacks sufficient concern for competition. *See* 16 U.S.C. § 8251(b).

### *ORDER*

The motions of New England Power Company and New England Electric System (Docket Nos. 53 & 80) and of Pacific Gas & Electric Corporation (Docket No. 81) to dismiss Norwood's Second Amended Complaint are *ALLOWED*. Defendant's motion to dismiss (Docket No. 3) is *DENIED* as moot.