<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 99-1047

                TOWN OF NORWOOD, MASSACHUSETTS,

                     Plaintiff, Appellant,

                               v.

 NEW ENGLAND POWER COMPANY, NEW ENGLAND ELECTRIC SYSTEM (NEES),
     PACIFIC GAS & ELECTRIC COMPANY, and PG&E CORPORATION,

                     Defendants, Appellees.
                                 

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

           [Hon. Patti B. Saris, U.S. District Judge]

                             Before

                   Boudin, Stahl and Lipez,
                                
                       Circuit Judges.  
                                
                                
                                
    Charles F. Wheatley, Jr. with whom Wheatley & Ranquist,
Kenneth M. Barna, Alan K. Posner and Rubin & Rudman were on brief
for plaintiff.
    Edward Berlin with whom Robert V. Zener, Swidler Berlin
Shereff Friedman, LLP, John F. Sherman, III, Associate General
Counsel, The NEES Companies, David H. Erichsen, Peter A. Spaeth and
Hale and Dorr LLP were on brief for appellees New England Power
Company and New England Electric System (NEES).
    Steven W. Phillips with whom Richard M. Brunell, Robert L.
Bocchino, Jr. and Foley, Hoag & Eliot LLP were on brief for
appellees Pacific Gas & Electric Company and PG&E Corporation.

February 2, 2000

                                
                                
 BOUDIN, Circuit Judge.  The Town of Norwood,
Massachusetts ("Norwood") filed a complaint against New England
Power Company ("New England Power") and others alleging antitrust
violations and breach of contract.  The district court dismissed
the complaint and Norwood now appeals.  This decision assumes a
familiarity with our decision today in Nos. 98-1847 et al., Town of
Norwood v. FERC, resolving petitions filed by Norwood and another
challenging orders of the Federal Energy Regulatory Commission
("FERC") in related administrative proceedings.

                        I.  THE HISTORY
 To summarize the facts, New England Power is a major
wholesaler of electric power in New England, and Norwood owns and
operates a municipal utility that distributes retail electric power
to residents and businesses in the town.  For some years Norwood
purchased its power at wholesale from Boston Edison Company, but in
the 1970s Norwood sought instead to purchase its power from New
England Power and have that power delivered over the intercity
transmission network of Boston Edison.  Boston Edison and New
England Power resisted, but the matter was resolved by settlement
after Norwood brought an antitrust suit against them.
 The settlements, arrived at in 1980 and 1983, included
the agreement of Boston Edison to "wheel" power for Norwood over
Boston Edison's transmission network and the agreement of New
England Power to furnish all of Norwood's requirements for
electricity through October 31, 1998, under New England Power's
FERC Tariff No. 1 "as [it] may be amended from time to time."  
Under that tariff, New England Power then supplied power to its own
retail affiliates such as Massachusetts Electric Company ("Mass
Electric").  The decree in the antitrust case directed that the
annexed settlement agreement and power contract were "approved as
a settlement of this case and shall be carried out by both
parties."
 The parties amended the power contract in 1989 to give
Norwood an option to extend the minimum term, and it then exercised
the option to extend the contract to at least October 31, 2008.  
Each side could terminate on seven years' advance notice.  New
England Power had somewhat similar requirements contracts with its
own affiliates and with other independent retailers embodying
similar lengthy periods of notice before termination.  The function
of such lengthy notice periods is to permit stability for each
side; the wholesaler, for example, ordinarily makes investments or
other arrangements to assure a stable supply of power either by
generation, purchase contracts of its own, or both.  See generally
Kentucky Utils. Co. v. FERC, 766 F.2d 239, 243 (6th Cir. 1985).
 Beginning in December 1996, New England Power made a set
of regulatory filings to restructure itself and to revise its
existing tariffs for wholesale power sales in Massachusetts and
Rhode Island.  These filings, described in more detail in our
companion decision, had several aims:  approval by FERC of the sale
of New England Power's non-nuclear generating facilities to a west
coast utility; the release of New England Power affiliates like
Mass Electric from their long-term obligations to purchase their
power from New England Power; and the restructuring of New England
Power's wholesale rates to affiliates and interested purchasers to
facilitate customer choice and market-based pricing at both the
wholesale and retail level.
 To accommodate policies of both the Massachusetts and
Rhode Island state utility commissions, New England Power also
proposed a temporary, non-cost-based wholesale offering called
"standard offer service."  This temporary offering was to provide
power at predetermined rates, increasing rapidly over a multi-year
period, to those retailers required by the states to offer
counterpart retail standard offer rates to their own customers; the
states were introducing competition at the retail level and wanted
retail purchasers to have an initial low-rate offering as a backup
while competitive sources of supply developed for them, e.g., In re
Massachusetts Elec. Co., Mass. D.P.U. 96-25, at 23-25 (Feb. 26,
1997); see also Mass. Gen. Laws ch. 164,  1B(b); R.I. Gen. Laws  
39-1-27.3.  Such retail sellers include Mass Electric and other
investor-owned retailers but not municipalities like Norwood, which
have no obligation to allow competitive access to their customers.  
See Mass. Gen. Laws ch. 164,  47A.
 The prospective sale by New England Power of its low-cost
hydroelectric and fossil generating facilities posed a potential
problem for existing requirements-contract purchasers like Norwood,
since New England Power's existing tariff rates (filed with FERC
and incorporated by reference into power contracts) were normally
amended to provide for price increases as New England Power's costs
went up.  To meet this objection, New England Power proposed to
implement a rate freeze that would prevent increases in wholesale
rates for its requirements-contract customers, including Norwood,
during the term of their agreements.
 While the initial filings of various proposals were under
consideration by FERC, Norwood, on April 14, 1997, filed the
present suit in the district court; this complaint, as later
amended, named as defendants New England Power, its parent New
England Electric System, and two companies that were part of the
California-based parent utility system (collectively "PG&E") whose
subsidiary ("USGenNE") was to acquire New England Power's non-
nuclear generating facilities in New England.  Between the original
filing of the complaint and its later substantial revision through
two amendments, additional events took place that are important to
the present action.
 First, in the FERC proceedings, the Commission ultimately
approved a settlement agreement permitting (on payment of contract
termination charges) early termination of requirements contracts by
the affiliates of New England Power, New England Power Co., 81
F.E.R.C.  61,281 (1997), reh'g denied, 83 F.E.R.C.  61,265
(1998); approved the offering of the new backup wholesale standard
offer service, id.; approved the transfer of generating facilities
and associated contracts to USGenNE, New England Power Co., 82
F.E.R.C.  61,179 (1998), reh'g denied, 83 F.E.R.C.  61,275
(1998); and agreed to the FERC Tariff No. 1 rate freeze that would
prevent post-divestiture rate increases to purchasers who chose to
avoid the termination charge by continuing as wholesale customers
of New England Power under their existing contracts, id.
 Second, regarding itself as disadvantaged by the
wholesale standard offer service made available to New England
Power's retail affiliates--whom Norwood regards as retail
competitors--Norwood notified New England Power on March 4, 1998,
that it was switching to a different wholesale supplier, Northeast
Utilities; a tariff and agreement to that effect were filed with
FERC and have gone into effect.  Two weeks later, on March 18,
1998, New England Power filed a revised FERC Tariff No. 1
permitting its non-settling wholesale customers like Norwood to
terminate their contracts early, and on only 30 days' notice, with
the condition that the customers pay a large contract termination
charge.  The charge was calculated based on the revenues that New
England Power would have expected to collect had a customer
continued to pay the now-frozen tariff rate through the contract
term, less the expected costs avoided by not providing service.
 As finally amended in April 1998, Norwood's complaint
made a number of separate claims.  In count 1, it charged that New
England Power had violated the prior 1983 antitrust decree and
power contract by divesting itself of its generating facilities,
shifting Norwood to a fixed rate based on pre-divestiture costs,
and proposing to serve its own affiliates on a quite different
basis than the fixed rate (namely, market-based rates subject to
the availability of the initially low-cost wholesale standard offer
service).
 The remaining three counts in Norwood's second amended
complaint charged violations of sections 1 and 2 of the Sherman
Act, 15 U.S.C.  1-2, and sections 3 and 7 of the Clayton Act, 15
U.S.C.  14, 18.  The company attacked the contract termination
charge imposed on Norwood under the revised FERC No. 1 Tariff as an
illegal restraint of trade, an unlawful tying arrangement, and, in
combination with the standard offer rates, an illegal price
squeeze; it alleged a conspiracy to fix prices in the wholesale
market; and it alleged a lessening of competition from the transfer
of New England Power's non-nuclear generating assets to USGenNE.
 After a motion by Norwood for partial summary judgment
and motions to dismiss by the defendants, the district court on
September 28, 1998, entered a decision dismissing the complaint
under Fed. R. Civ. P. 12(b)(6).  Town of Norwood v. New England
Power Co., 23 F. Supp.2d 109 (D. Mass. 1998).  In doing so, the
court considered the allegations in the complaint, documents
attached to it, and matters of public record including FERC
decisions.  In substance, the court rested its decision on FERC's
scrutiny of the same transactions, the so-called filed rate
doctrine, and the terms of the settlement agreement and power
contract between Norwood and New England Power.

                        II.  DISCUSSION
 1.  At the threshold of this appeal is a substantial
claim by New England Power that a procedural error by Norwood
deprives us of jurisdiction to consider Norwood's main claims.  
After the district court entered its decision and judgment, Norwood
filed a timely motion under Fed. R. Civ. P. 59(e) to alter or amend
the judgment; after this was denied, it filed a notice of appeal in
this court challenging the denial.  Norwood then filed a motion
under Fed. R. Civ. P. 60(b) for relief from the judgment on grounds
of newly discovered evidence and, in the alternative, moved for a
second time under Fed. R. Civ. P. 59(e) to alter or amend the
judgment.
 The district court denied both of the new motions, and
Norwood then filed an amended notice of appeal challenging the
denial of its post-judgment motions; but Norwood did not mention in
either its original or amended notice of appeal the district
court's original decision and judgment.  New England Power points
out that Norwood's brief is directed almost entirely to the
original decision and judgment from which it says that Norwood did
not appeal.
 The law on this issue is less clear than the cases claim
it to be.  On the one hand, courts often say that a notice of
appeal that names only a post-judgment order as the subject of the
appeal does not bring the original judgment before the appellate
court.  E.g., Mariani-Giron v. Acevedo-Ruiz, 945 F.2d 1, 3 (1st
Cir. 1991).  On the other hand, because in such cases the failure
to name the underlying judgment is usually a slip of the pen and
rarely causes any prejudice to the other side, courts then go
through endless contortions to rescue the technically defaulted
portion of the appeal.  See 11 Wright, Miller & Kane, Federal
Practice and Procedure  2818, at 192-93 & n.11 (2d ed. 1995)
(collecting cases).
 Sometimes this resurrection can be justified in common-
sense terms where, for example, the caption of the notice refers to
a post-judgment order but the body also refers to the underlying
judgment, see In re San Juan Dupont Plaza Hotel Fire Litig., 45
F.3d 564, 567 (1st Cir. 1995), or where the appellant previously
filed a premature notice of appeal challenging the underlying
judgment, ineffective by itself but illustrating an intent to
attack the judgment, see Foman v. Davis, 371 U.S. 178, 180-82
(1962); LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 839-40 (1st Cir.
1993), cert. denied, 511 U.S. 1018 (1994).  The latter is what
occurred in Foman, relied upon by Norwood in this case.  But
Norwood did not file a premature notice of appeal designating the
original judgment.  Cf. Gottesman v. INS, 33 F.3d 383, 388 (4th
Cir. 1994).
 However, Norwood's timely first motion to alter or amend
the judgment--from denial of which Norwood did file a timely
appeal--is not an ordinary Rule 59(e) motion limited to a narrow
criticism or new objection.  Instead, the motion covers (in 59
pages) more or less the same points that Norwood had earlier made
to the district court and now repeats to us; indeed, the district
court tersely denied the motion relying on its original decision.  
Under these circumstances, it seems to us that Norwood's appellate
arguments are within the scope of its Rule 59(e) motion and are
properly before us on appeal from the denial of that motion.
 2.  Turning to the merits, the first count in Norwood's
complaint--effectively, a contract claim--rests on its assertion
that New England Power breached its 1983 promises.  According to
Norwood, New England Power was obligated to supply Norwood with
power during the contract term, on a cost-justified, FERC-regulated
basis, at the same rate level at which power was offered to
affiliates of New England Power.  Norwood asserts that New England
Power breached these supposed promises by selling its low-cost
generation facilities, providing Norwood with a substitute fixed
rate based on pre-divestiture costs, and switching to market-based
and standard offer rates for sales to its own affiliates.
 The explicit target of this count is the contract
termination charge imposed by the amended FERC Tariff No. 1 on non-
settling purchasers who choose to terminate their requirements
contracts without giving the requisite multi-year notice.  Since
other Tariff No. 1 purchasers (including the affiliates) appear to
have settled, Norwood may be the only purchaser left in this
category--although the other purchasers will also pay contract
termination charges computed on a somewhat different basis.  
Norwood says the alleged breach by New England Power excuses
Norwood's own abandonment of the contract, thereby avoiding a
termination charge allegedly amounting to about $78 million over
the remainder of the ten-year period.
 The district court rejected Norwood's contract claim on
two different grounds.  It said that the claim was barred by the
filed rate doctrine which--in the aspect pertinent here--limits
attacks outside the regulatory process on tariffed rates filed with
federal regulatory agencies.  E.g. Arkansas La. Gas Co. v. Hall,
453 U.S. 571 (1981).  The district court also ruled, in the
alternative, that the agreements were not breached by New England
Power, because all it had promised to do was to provide FERC Tariff
No. 1 rates to Norwood, which New England Power continued to do
until Norwood itself renounced its requirements contract in March
1998.  Town of Norwood, 23 F. Supp.2d at 119.
 We agree with Norwood that the filed rate doctrine does
not bar Norwood's contract claim.  It is true that, absent some
exception, Norwood could not use its contract claim as a vehicle to
attack the validity of the FERC tariff imposing the termination
charge; the filed rate doctrine protects the agency's authority
over tariffed rates and prefers a prevailing tariff (unless set
aside by the agency) over any separate contractual arrangements,
AT&T v. Central Office Tel., Inc., 524 U.S. 214, 222-24 (1998).  
While the termination charge is not a traditional "rate" for
continuing service, the filed rate doctrine sweeps more broadly and
governs ancillary conditions and terms included in the tariff.  Id.
at 224-25.
 Yet, under the amended tariff itself, whether a
termination charge applies depends on whether there is a
requirements contract in force.  And FERC has at most approved only
the generic terms of the amended tariff; it has not determined
whether Norwood's prior obligation to buy from New England Power
was vitiated by a breach on the part of New England Power, New
England Power Co., 84 F.E.R.C.  61,175, at 61,920 (1998), or some
other means.  See note 2, above.  Perhaps it could have decided
such issues, but it often leaves contract breach issues to courts,
Southern Cal. Edison Co., 85 F.E.R.C.  61,023, at 61,069 (1998),
and it appears to have done so here.  Thus, the tariff may be
protected by the filed rate doctrine but whether the tariff applies
to Norwood depends on the extent of Norwood's contractual
obligations.
 This brings us to the district court's alternative
holding that New England Power did not breach the contract.  The
facts claimed by Norwood to be such a breach are undisputed; they
are the sale of facilities, the new terms for other customers, and
the freezing of Norwood's rate.  The question is whether those acts
comprised a breach of contractual terms, an issue of law to be
determined from the words of the contract, if they are unambiguous,
and otherwise by the words along with whatever extrinsic evidence
may cast light on the parties' intent.  Bank v. IBM, 145 F.3d 420,
424 (1st Cir. 1998).  Here, the district court found that the words
alone refuted Norwood's claim.  Town of Norwood, 23 F. Supp.2d at
119.
 The original 1983 power contract is pithy in its
pertinent language:  New England Power promises to supply Norwood
its requirements pursuant to the former's FERC No. 1 Tariff, "filed
with FERC, as [it] may be amended from time to time."  At the time,
New England Power's FERC Tariff No. 1 was its general cost-based
offering of power to wholesale customers.  But nothing in the
contract explicitly required that the power be furnished from any
specific set of generating facilities, or that New England Power's
own affiliates continue to buy their power under this tariff, or
that the rates be based upon costs calculated under any specific
cost formula covering any specific period.
 Norwood argued in the district court that the agreement's
terms were ambiguous and, specifically, that "FERC Tariff No. 1"
had a specialized meaning and reflected implicit conditions, i.e.,
that the rates be based on current costs and used equally for New
England Power's own affiliates.  But while extrinsic evidence can
be admitted to show ambiguity and to resolve it, see Donoghue v.
IBC USA (Publications), Inc., 70 F.3d 206, 215 (1st Cir. 1995),
Norwood's affidavits show only that its aim was to achieve those
goals and that FERC Tariff No. 1 was at that time structured as a
traditional utility offering.  Accordingly, we agree with the
district court that the contract did not contain a promise that
ownership of New England Power's facilities or equality of
treatment vis  vis New England Power's affiliates would endure.
 Probably Norwood assumed at the time that the world would
continue as before, but there is an important difference between
assumptions that exist when a contract is signed and promises built
into a contract comprising a commitment.  Under certain
circumstances, the mere failure of underlying assumptions can
release a party from a contract--one specific doctrine is
frustration of purpose--but it would take a developed line of
reasoning, legal precedent, and specific facts showing the
centrality of the assumptions and the extent to which their
alteration makes it unjust to hold the unhappy party to its own
promises.  See generally II Farnsworth, Farnsworth on Contracts ch.
9 (2d ed. 1998).
 Norwood has made no such developed argument based on
disappointed assumptions.  The argument would probably be uphill in
any event since New England Power has continued to offer Norwood
the gist of what it was promised:  a cost-based, long-term supply
of electricity, subject to FERC regulation.  In all events, it is
normally not error at all, let alone plain error, for a court to
ignore a possible claim or defense that a party fails to proffer
and pursue.  E.g., Amcel Corp. v. International Executive Sales,
Inc., 170 F.3d 32, 35-36 (1st Cir. 1999).   
 3.  This brings us to Norwood's pure antitrust claims,
which are almost certainly weaker but (ironically) less easily
disposed of on a motion to dismiss.  Although there are numerous
strands in Norwood's antitrust claims, two are of foremost
importance.  One is a claim, primarily based on section 2 of the
Sherman Act, that New England Power has engineered a "price
squeeze" designed to undercut Norwood's ability to compete with New
England Power's own retail affiliates.  The other is a claim under
section 7 of the Clayton Act that New England Power's sale of
assets threatens to increase wholesale power prices in New England
for purchasers like Norwood.
 The district court dismissed all of Norwood's antitrust
claims based on the filed rate doctrine.  As already noted, one
aspect of the doctrine protects a party from civil claims based on
its implementation of tariffed rates (and ancillary tariffed
matters) that are directly regulated by federal agencies like FERC.  
Its origin is the now-ancient Keogh v. Chicago & N.W. Ry. Co., 260
U.S. 156 (1922); but not very long ago the Supreme Court reaffirmed
the Keogh doctrine in Square D Co. v. Niagara Frontier Tariff
Bureau, 476 U.S. 409 (1986), despite Judge Friendly's view that the
doctrine had outlived its usefulness, Square D Co. v. Niagara
Frontier Tariff Bureau, 760 F.2d 1347 (2d Cir. 1985).
 Norwood's price squeeze claim, in particular, rests on
the combined effect of two different tariffs:  the contract
termination charge imposed on Norwood under New England Power's
amended FERC Tariff No. 1; and the wholesale standard offer rate
that was offered to New England Power's affiliates but not to
municipalities like Norwood, a tariffed offering originally filed
by New England Power and assumed by USGenNE as part of the FERC-
approved asset sale.  Both tariffs are not only subject to FERC
regulation under the "just and reasonable" standard imposed by the
Federal Power Act, 16 U.S.C.  824d(a), but they were also actively
at issue in the FERC proceedings described in our companion
decision.
 The question, then, is whether Norwood can establish a
pertinent limitation on or exception to the filed rate doctrine.  
Norwood's broadest claim is that the doctrine should not apply to
antitrust cases involving price squeezes, a view endorsed in some
measure by several circuits, City of Kirkwood v. Union Elec. Co.,
671 F.2d 1173, 1177-79 (8th Cir. 1982), cert. denied, 459 U.S. 1170
(1983); City of Groton v. Connecticut Light & Power Co., 662 F.2d
921, 929 (2d Cir. 1981), and by the always enlightening Areeda
treatise, IA Areeda & Hovenkamp, Antitrust Law  244e (rev. ed.
1997).  But the Supreme Court has itself applied the filed rate
doctrine to antitrust claims generally, e.g., Square D Co., 476
U.S. 409, and most of the lower court cases that have excluded
particular price squeeze claims appear to have done so on grounds
that do not apply here.
 Specifically, the traditional price squeeze involves a
defendant who as monopolist supplies the plaintiff at one level
(e.g., wholesale), competes at another (e.g., retail), and seeks to
destroy the plaintiff by holding up the wholesale price to the
plaintiff while depressing the retail price to common customers.  
See Town of Concord v. Boston Edison Co., 915 F.2d 17, 18 (1st Cir.
1990), cert. denied, 499 U.S. 931 (1991).  A few decisions, like
City of Kirkwood, have rejected the filed rate defense in such
situations where the monopolist supplier was subject to federal
regulation at the wholesale level but not at the retail level.  671
F.2d at 1177-79.  But the main concern--that no regulatory agency
could afford full relief--is inapposite here because FERC regulates
both of the tariffs in question.  See IA Areeda & Hovenkamp, supra,
244e, at 90-91.
 Next, Norwood says that the filed rate doctrine should
not apply where the "regulated" rates have been left to the free
market, the general direction in which FERC is moving.  Of course,
if New England Power's rates were truly left to the market, with no
filing requirement or FERC supervision at all, the filed rate
doctrine would by its terms no longer operate.  See IA Areeda &
Hovenkamp, supra,  241c, at 30; cf. Carnation Co. v. Pacific
Westbound Conference, 383 U.S. 213 (1966).  But unlike some other
regulatory agencies, see IA Areeda & Hovenkamp, supra,  251i, at
161-62, FERC is still responsible for ensuring "just and
reasonable" rates and, to that end, wholesale  power rates continue
to be filed and subject to agency review, 16 U.S.C.  824d.   
 To be sure, FERC now waives its requirement that filed
rates and rate increases be accompanied and justified by cost-of-
service data, 18 C.F.R.  35.12, 35.13, where the applicant has
shown that it lacks, or has mitigated, market power in generation
and transmission.  See generally Louisiana Energy & Power Auth. v.
FERC, 141 F.3d 364, 365 (D.C. Cir. 1998).  But whether or not such
data was submitted, the relevant rates and termination charge were
individually filed with FERC and are subject to ongoing FERC
regulation.  It is the filing of the tariffs, and not any
affirmative approval or scrutiny by the agency, that triggers the
filed rate doctrine.  See Square D Co., 476 U.S. at 417;
Mississippi Power & Light Co. v. Mississippi, 487 U.S. 354, 374
(1988).
 Further, FERC did address the concerns presented by
Norwood and others about the potential anticompetitive effects of
the filings (albeit not in trial-type hearings).  FERC found the
contract termination charge to be in principle a reasonable
recovery of expected revenues less avoided costs.  New England
Power Co., 83 F.E.R.C.  61,174, at 61,723 (1998).  As for the
wholesale standard offer rate schedule, FERC explained its origins
in state regulatory policy and was apparently unpersuaded by
Norwood's objections.  New England Power Co., 82 F.E.R.C.  61,179,
at 61,664-65 (1998); see also New England Power Co., 83 F.E.R.C.  
61,265 (1998).  The agency left the door open for future
administrative challenges to both the contract termination charge
and the wholesale standard offer rate.  New England Power Co., 83
F.E.R.C.  61,174, at 61,724; New England Power Co., 81 F.E.R.C.  
61,281, at 62,371 (1997).
 Norwood also objects that the filed rate doctrine only
protects against damage claims and, it says, in this instance it
seeks declaratory and injunctive relief; apparently it contemplates
relief that would block or nullify the termination charge and
possibly require the wholesale standard offer rates to be made
available to it.  It is quite true that one rationale of the filed
rate doctrine is to prevent discriminatory damage awards to
different customers, Keogh, 260 U.S. at 163, and that in at least
two cases the Supreme Court carved out a potential exception for
antitrust injunctive relief, see Square D Co., 476 U.S. at 422 &
n.28; Georgia v. Pennsylvania Ry. Co., 324 U.S. 439, 454-62 (1945).
 But in Georgia and Square D, the Court was concerned with
possible price-fixing conspiracies that conceivably could have been
enjoined without tampering with the tariffed rates themselves, see
Georgia, 324 U.S. at 455; the relief would merely assure non-
collaborative individual filings by the supposed conspirators.  
Here, any meaningful relief as to the price squeeze would require
the alteration of tariffs--and not merely tariffs subject to
regulation but tariffs actually scrutinized repeatedly by FERC in
the companion-case proceedings.  In part, the rationale for the
filed rate doctrine is to protect the exclusive authority of the
agency to accept or challenge such tariffs, Arkansas La. Gas Co. v.
Hall, 453 U.S. 571, 577-78 (1981)--a goal that would be undermined
by Norwood's distinction in the present case.  
 Norwood also argues that the doctrine should not apply to
block a claim brought by a plaintiff who is a competitor of the
defendant--a view basically endorsed by the Areeda treatise, see IA
Areeda & Hovenkamp, supra,  247c.  But the lower courts are both
divided and confused in their discussion of this issue; and there
are more than two sides.  Attempts to reason from the few arguably
relevant Supreme Court cases, see AT&T v. Central Office Tel.,
Inc., 524 U.S. 214 (1998); Georgia v. Pennsylvania Ry. Co., 324
U.S. 439 (1945), are almost hopelessly inconclusive, but no such
exception for plaintiff-competitors has ever been explicitly
adopted by that court.
 This is a more doubtful case than most for developing a
new "competitor" exception to the filed rate doctrine.  Although
Norwood may be in limited competition with New England Power
affiliates, it is primarily a consumer challenging a filed rate
that it does not want to pay (the contract termination charge),
and--as we will see--its position as a "competitor" is qualified.  
Although one case to which Norwood points has adopted a competitor
exception where the plaintiff was both a competitor and a consumer,
City of Groton, 662 F.2d at 927-29; cf. City of Kirkwood, 671 F.2d
at 1179, it appears to have been a standard price squeeze case
where one of the relevant prices was not reviewable by the federal
agency.  City of Groton, 662 F.2d at 927.
 Finally, Norwood contends that a savings provision added
by the Energy Policy Act of 1992, 16 U.S.C.  824k(e)(2), somehow
overrides the filed rate doctrine.  The provision provides that
"[s]ections 824i, 824j, 824l, 824m of this title, and this section,
shall not be construed to modify, impair, or supersede the
antitrust laws."  Id.  But by its terms this provision only refers
to limited sections of the Federal Power Act, notably not including
those that establish the rate filing requirements, 16 U.S.C.  
824d, and to which the filed rate doctrine relates.
 As already noted, the law on the filed rate doctrine is
extremely creaky.  Our own principal price squeeze decision, Town
of Concord v. Boston Edison Co., 915 F.2d 17 (1st Cir. 1990), cert.
denied, 499 U.S. 931 (1991), threw out the claim on the merits,
expressing great skepticism about such claims as to regulated rates
but never mentioning the filed rate doctrine.  Id. at 25-29.  Yet
this case is not a good vehicle for considering any cutting back on
the doctrine, to whatever extent Square D permits adjustment,
partly because the Sherman Act claims pressed by Norwood are
themselves so doubtful.
 There are at least two grounds for extreme skepticism.  
The usual section 2 claim requires monopoly or near monopoly power
in some market, and a wrongful exclusionary act designed to enhance
such power in that market or to achieve an improper advantage in
another market.  E.g., Otter Tail Power Co. v. United States, 410
U.S. 366, 377 (1973); United States v. Grinnell Corp., 384 U.S.
563, 570-71 (1966).  It is not clear just what monopoly power
Norwood attributes to New England Power, which has now sold its
main generating assets and, so far as it may retain a dominant
position in transmission, is constrained to wheel power for others
under Order No. 888.  See New England Power Co., 82 F.E.R.C.  
61,179, at 61,662 (1998).
 Further, it is hard to see just what wrongful act is
involved.  Although sustained by FERC's regulatory policies, the
termination charge is largely a surrogate for recovery of net
proceeds from a prior contract renounced by Norwood; and the
refusal to give Norwood the benefit of the wholesale standard offer
rates appears to reflect the fact that as a municipality Norwood is
not required to provide competitors access to its customers or
afford them retail standard offer rates.  Mass. Gen. Laws ch. 164,
47A.  These are very far from the usual kinds of wrongdoing that
support a section 2 claim.
 It is also very far from clear that Norwood is seriously
threatened as a competitor.  Apparently most of its customers are
captive, see Mass. Gen. Laws ch. 164,  47A, and Norwood has no
obligation to give them access to other suppliers, id.  Some fringe
competition may exist for new customers who can choose where to
locate, or old ones inclined to relocate--e.g., customers choosing
between Norwood and adjoining communities serviced by Mass
Electric.  But the extent that such choices may be affected by the
standard offer rates is unclear.  The rates are not automatically
available to benefit either new customers or those who move, Mass.
Regs. Code tit. 220,  11.04(9)(b)(2)(c); and the advantage they
provide will disappear fairly soon because the rates quickly
escalate.
 Of course, doubts about market power cannot be resolved
on a motion to dismiss; and the "wrongful act" issue, although
technically legal, has not been briefed and might depend in some
measure on contextual facts at which we can only guess.  But these
doubts do reinforce a sense that this is not a case that calls out
for revisiting the filed rate doctrine or for strenuous efforts to
carve out exceptions that test the limits of the Supreme Court's
reaffirmation of the doctrine in Square D.
 Norwood also makes a section 1 claim that the standard
offer rates New England Power promised to other retailers as part
of the settlement somehow constitute horizontal price fixing.  But
offer of those rates to customers is an ordinary vertical
transaction, and the settlement did not set rates for other
wholesale suppliers; USGenNE's later assumption of the obligation
is simply the transfer of the seller's existing obligation incident
to a sale of assets.   
 4.  This brings us to Norwood's other antitrust claim
worth discussing, namely, that New England Power's sale of its
fossil and hydroelectric generating assets violates section 7 of
the Clayton Act.  The main charge here is that the sale will
enhance market power in the wholesale electricity market in New
England and tend to exert upward pressure on wholesale prices to
the detriment of purchasers in that market, including Norwood.  
This claim is very doubtful, but it is not clear how it can be
resolved on this appeal solely upon a motion to dismiss.
 Ordinarily, the transfer of generating assets to a new
entrant could hardly reduce competition:  it lessens the market
power of the seller and adds a new competitor.  But USGenNE's
parent already owns some nearby generating assets (apparently in
New York); and depending on their size and the definition of
markets, in theory USGenNE and its New York affiliate could end up
together with more market power than previously possessed by New
England Power itself.  True, market power in transmission and
distribution may be vitiated by the open access requirements
imposed by FERC's Order No. 888 (discussed further in our
companion opinion); but greater concentration of generating assets
in a few hands--the hands of USGenNE and its associated companies--
could still be a problem, depending upon how feasible long distance
transmission may be (and Norwood's complaint vaguely alleges some
limitations).
 On this claim, the filed rate doctrine is of no use to
the defendants.  For reasons that reflect more history than logic,
the limitations on antitrust litigation derived from federal
administrative regulation reflect a schizophrenic split.  Direct
antitrust attacks on federally regulated rates have (with some
exceptions discussed above) been limited by the filed rate
doctrine.  E.g., Square D Co., 476 U.S. 409.  So have attacks on
other regulated matters underlying rates (like power allocation
among electricity customers).  See Mississippi Power & Light Co. v.
Mississippi, 487 U.S. 354, 371 (1988); Nantahala Power & Light Co.
v. Thornburg, 476 U.S. 953, 966-67 (1986).  But the Supreme Court
says there is otherwise no across-the-board antitrust immunity for
agency-approved transactions.  See California v. Federal Power
Comm'n, 369 U.S. 482 (1962).
 Although it is not clear in all cases where the boundary
lies between the filed rate doctrine and the default rule retaining
antitrust liability, mergers or sales of assets by federally
regulated utilities have been left open to antitrust challenge even
though the resulting rates were subject to federal regulation and
even though the merger or sale had been explicitly approved by the
regulator.  See Northeast Utils. Serv. Co. v. FERC, 993 F.2d 937,
947 (1st Cir. 1993).  See generally California, 369 U.S. 482.  
Sometimes federal agencies do have explicit power to immunize
approved mergers, see Denver & Rio Grande Western Ry. Co. v. United
States, 387 U.S. 485, 496-97 (1967), but FERC does not.  Cf. South
Austin Coalition Community Council v. SBC Communications Inc., 191
F.3d 842, 844 (7th Cir. 1999).
 This discrepancy in case-law treatment is debatable
policy, see generally IA Areeda & Hovenkamp, supra,  243
(criticizing California v. Federal Power Commission), and there may
well be sound arguments for revisiting the issue in light of recent
improvements in FERC's analysis of mergers and asset transfers, see
generally Pierce, The Antitrust Implications of Energy
Restructuring, 12 Nat. Resources & Env't 269 (1998).  But the
distinction has been adopted by the Supreme Court and never
abandoned, compare Otter Tail Power Co., 410 U.S. at 373, with
Square D Co., 476 U.S. 409, and the defendants have not even
attempted to defend the use of the filed rate doctrine to protect
the sale.
 Instead, New England Power argues that Norwood lacks
standing to make a section 7 claim because the sale is not causally
linked to Norwood's primary concern, the contract termination
charge.  But at least as a matter of pleading, Norwood is still
entitled to make a section 7 claim as a consumer of wholesale power
on the premise that the sale will increase concentration in the
wholesale market and ultimately increase prices to it.  PG&E says
that Norwood is protected by its long-term contract with Northeast
Utilities, but long-term is not forever and what Norwood purports
to worry about is a long-term upward pressure on wholesale prices.
 Alternatively, PG&E complains that Norwood's complaint
has never identified the alleged pre- and post-divestiture market
shares attributed to PG&E affiliates.  Just how much detail is
required in notice-pleading complaints does not have a formulaic
answer; we have been willing to sustain dismissals where a
plaintiff's antitrust claim was expressed only in the bare words of
the statute, seemed highly improbable, and was not strengthened by
more specific detail offered in the face of a direct challenge on
motion to dismiss.  See, e.g., DM Research, Inc. v. College of Am.
Pathologists, 170 F.3d 53, 55-57 (1st Cir. 1999); see also II
Areeda & Turner, Antitrust Law  317a, at 72 (1978).
 But it is one thing to sustain a dismissal where the lack
of detail was an issue pressed in the district court and the
plaintiff, having had notice and incentive to respond, failed to do
so by bolstering its complaint, either by amendment or by providing
the requisite information in opposing dismissal.  Here, this "lack
of detail" claim was not clearly present in the district court and
is not even close to its ground of disposition; and the section 7
claim, although doubtful on the facts, is not inherently
impossible.  Cf. Tri-State Rubbish, Inc. v. Waste Management, Inc.,
998 F.2d 1073, 1080-81 (1st Cir. 1993).  We think that a deficiency
in detail is a matter to pursue on remand, although some form of
summary disposition on this ground may yet be available.
 A different reason for doubt as to the antitrust claim is
that FERC itself found, after a regulatory analysis, that the sale
would not enhance market power.  New England Power Co., 82 F.E.R.C.
61,179, at 61,658-59 (1998), reh'g denied, New England Power Co.,
83 F.E.R.C.  61,275 (1998).  So far as we can tell, this
determination rested in principal part on a judgment that power
generated by USGenNE affiliates in New York was already committed
under long-term contracts and was not therefore a viable constraint
on prices in New England.  New England Power Co., 82 F.E.R.C.  
61,179, at 61,659.  This is akin to an approach taken by the
Supreme Court itself in discounting the committed coal production
of a merger partner.  See United States v. General Dynamics Corp.,
415 U.S. 486, 501-11 (1974).
 Whatever its rationale, FERC's ultimate finding, if
right, probably dooms Norwood's Clayton Act claim.  There is no
indication that FERC's test of competition (applying the same
guidelines as the Department of Justice and Federal Trade
Commission, see New England Power Co., 82 F.E.R.C.  61,179, at
61,658 (1998)) is weaker or significantly different than that of
the Clayton Act.  See IV Areeda, Hovenkamp & Solow, Antitrust Law
932d (1998) (discussing judicial approval of DOJ-FTC guidelines).  
Norwood was a party in the regulatory proceeding that led to the
finding and actively contested the issue.
 One might expect that FERC's finding in the regulatory
proceeding would be binding on Norwood under the doctrine of issue
preclusion.  But the question turns out to be complicated:  even
where the parties are the same, issue preclusion based on an
administrative determination is sometimes allowed and sometimes
not, depending on the nature of the proceeding, the nature of the
issue, the procedural rights afforded, and other considerations.  
See Restatement (Second), Judgments  83 (1982); II Davis & Pierce,
Administrative Law Treatise  13.3-13.5 (3d ed. 1994).  The
preclusion issue has not been briefed by the parties in this court
and, if it is to be pursued, this is best done on remand.
 A final problem for Norwood relates to relief.  Even on
the doubtful assumption that the sale has created a threat of
increased market power sufficient for a Clayton Act violation, it
may be not easy for Norwood to show monetary damages now.  And
while divestiture is technically a remedy permitted to private
parties in section 7 suits, the Supreme Court has suggested that it
may not always be proper at the behest of private parties even
where the government could have secured it.  California v. American
Stores Co., 495 U.S. 271, 295-96 (1990).
 The parties may wish to consider on remand whether these
loose ends justify further litigation.  There may be an equitable
case for some further accommodation of Norwood, at least as to the
amount of any termination charge, especially if the settling
parties have gotten better terms.  Cf. New England Power Co., 83
F.E.R.C.  61,174, at 61,723 n.13 (1998).  Given the possibilities
of further expensive litigation (on certiorari, in the district
court, and at FERC), it may be worth the parties' time to consider
a settlement before pressing further.
 The district court's judgment dismissing the complaint on
the merits is affirmed as to all claims other than that under
section 7 of the Clayton Act; and the section 7 claim is remanded
to the district court for further proceedings consistent with this
decision.
 It is so ordered.

</body>

</html>